[No. 10109.  *En Banc.*  May 14, 1913.]

# ROLLIN M. MARSH, *Respondent*, v. USK HARDWARE COMPANY et al., *Appellants.*[1]

EXPLOSIVES—SALE—LIABILITY—NEGLIGENCE OR DECEIT. It is immaterial whether liability for misrepresentations in the sale of explosives is based upon technical deceit or negligence, assuming that they were the proximate cause of the injury sustained in handling the explosive.

EXPLOSIVES—NEGLIGENCE—REPRESENTATIONS—LIABILITY OF MANUFACTURER—QUESTION FOR JURY. It is a question for the jury to determine whether a retail dealer was authorized by a powder manufacturing company to make certain specific representations in detail as to the method of handling the powder, where the manufacturing company had issued circulars making the most comprehensive claims as to the safety of using the powder in ways different from using other explosives, and where reasonable minds might differ as to the construction of the language and it could not be said, as a matter of law, that the specific statements of the dealer went beyond those made in the circulars.

SAME — REPRESENTATIONS — CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY. Whether the purchaser of a new blasting powder could reasonably rely upon the manufacturer's circular making comprehensive claims as to its safety, and upon statements of the retail dealer making the sale as to the proper method of use, is a question for the jury, where reasonable minds would not necessarily arrive at the same conclusion thereon.

SAME — NEGLIGENCE — LIABILITY OF MANUFACTURER. A manufacturer of a high explosive who sells the same to retailers with an affirmative representation or guarantee as to its safety is liable to a purchaser from the retailer who is injured thereby without fault on his part, upon the theory of negligence and without regard to any contractual relations.

SAME—SALES—LIABILITY OF RETAILER. Retail dealers selling a new blasting powder are bound to know its character, and cannot escape responsibility for their own affirmative statements as to the proper manner of using it by showing that they relied upon circulars of the manufacturing company.

SAME—JOINT AND SEVERAL LIABILITY — INDEPENDENT REPRESENTATIONS. Where a powder manufacturing company and retail dealers selling its blasting powder both make negligent statements as to its

[1]Reported in 132 Pac. 241.

safety, they are jointly and severally liable to one injured thereby, although their statements were made independently and the retailer was not an agent of the manufacturer; since they both had a common interest in extending sales and were acting in a common end.

CORPORATIONS—TORTS—LIABILITY OF OFFICERS. The president and secretary of a powder company, who are also trustees, are presumptively actively engaged in managing its affairs where the company had no superintendent; and accordingly are equally liable with the company for its tort in negligently issuing a circular containing affirmative representations or guarantees as to the safety of its blasting powder, whereby a user thereof was injured.

EXPLOSIVES — CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY. Where a new blasting powder was sold under guarantees as to its safety and representations that it was different from other powders and could be tamped with an iron, the contributory negligence of a nonexpert user in tamping it with an iron is a question for the jury.

EVIDENCE—EXPERIMENTS—DISCRETION. In an action for injuries sustained through the premature explosion of a new blasting powder, represented to be different from other powders, it is discretionary to allow experiments with it in the presence of the jury, and error cannot be predicated thereon except for abuse of discretion.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT. A verdict for $20,000 damages for the entire loss of sight through an explosion is not excessive.

FULLERTON, J., dissents.

Appeal from a judgment of the superior court for Spokane county, Sullivan, J., entered June 7, 1911, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained through an explosion of blasting powder. Affirmed.

*Voorhees & Canfield*, for appellants.

*McCarthy & Edge*, for appellants Greenhalgh.

*Robertson & Miller* and *Thomas J. Corkery*, for respondent.

PARKER, J.—This is an action to recover damages for personal injuries rendering the plaintiff totally blind, which he alleges resulted to him from a premature explosion of a charge of blasting powder called "jexite," while he was load-

ing it into a drill hole in a manner which he was led, by representations made by the defendants, to believe to be safe. A trial before the court and a jury resulted in a verdict and judgment for $20,000 in favor of the plaintiff and against all of the defendants, from which they have appealed.

Appellants Charles Greenhalgh, R. Greenhalgh and L. R. Greenhalgh are copartners engaged in mercantile business, including the sale of the blasting powder called jexite, under the firm name of the Usk Hardware Company, at the town of Usk, in Pend Oreille county. Appellant National Powder Company is a domestic corporation with its principal place of business at Spokane, engaged in the manufacture and sale of the blasting powder called jexite. Appellants Jerome Drumheller and Alfred Coolidge are the president and secretary, respectively, of the National Powder Company, and together with J. L. Rice, constitute its board of trustees. Mr. Drumheller, when asked on the witness stand if the company had a general manager, answered, referring to the times here involved, "No, we didn't; I don't think we did, not officially." This is all of the information the record furnishes us on this subject, so the inference is that the business of the company was conducted directly by the trustees.

In the spring or early summer of 1910, the powder company caused to be printed and given out to the public the following circular:

NATIONAL POWDER COMPANY, INC.
401-402 Columbia Bldg.
Spokane, Wash.
Phone Main 1425. Cable Address "Drumheller."
Jerome L. Drumheller, President.
Alfred Coolidge, Sec. and Treas.

TO THE TRADE:

In making our initial bow and bid for a fair share of the powder trade, we come with a new and yet old explosive, but in a different and entirely new form. It is acknowledged and known by every

18—73 WASH.

user of blasting powder that all powders have their faults, and most of them very serious and disagreeable. Some are too weak to accomplish desired results; others have very offensive and dangerous fumes; others are so sensitive to friction and jars that the users' lives are always in danger, and so it goes down the line.

Now is there an explosive that will accomplish the requirements of man and have no faults nor weak points? Is it possible to make such a powder? We say "yes," and stand ready to prove every assertion we make.

First—Jexite No. 1 will break more rock than any known explosive pound for pound.

Second—It is absolutely safe to handle in every way.

Third—It cannot be exploded unless confined.

Fourth—It does not freeze and is always ready for use.

Fifth—It is eight to ten times stronger than black powder.

Sixth—It is nearly smokeless and gasless and gives forth no noxious fumes.

"SAFETY AND EFFICIENCY" covers about all there is to be said. A powder that is safe and will do the work, and do it well, is about all you want to know.

"JEXITE IS SAFE." It has been used by hundreds of miners and rock men in Canada for over two years, and in quantity by the hundreds of tons, and not one single life has been taken; not one man injured; not an accident; not a man to find fault. All say "It is the best powder we have ever used." Not one suit for damage in any way; no contractor need ever fear damage suits. *Jexite is safe—Jexite is the strongest powder in the world today.*

We are making powder every day.

Yours truly,

National Powder Co.,

H. D. Farris,                                  401 Columbia Block.

A. C. Jex,

Inventors and Patentees.

There were about 1,000 copies of this circular then printed, their issuance being begun about that time. Appellant Drumheller, the president, testified that he was absent at the time the circulars were "gotten out by the company." He does not otherwise disclaim any responsibility for their issuance nor claim to have at any time indicated disapproval thereof. It is clear that he knew of their printing, at least very soon thereafter. Appellant Coolidge did not testify or offer any explanation whatever as to his connection with the issuance of these circulars. Soon after their issuance,

one of the circulars was seen by respondent in a store at Usk, lying upon the counter, from where he took it home and read it. About September 10, 1910, respondent commenced to dig a well a short distance from the town of Usk, which, after several days' work thereon, he had sunk to a depth of about 22 feet. He worked in the bottom of the well, which was about five and a half feet in diameter. He had a neighbor assisting him, who hoisted the material out as the excavation proceeded. He had been using dynamite for blasting, to loosen the earth, which was a clay formation and evidently had some gravel mixed in it. After the well had been sunk to a considerable depth, the fumes following the dynamite explosions caused him to have a "powder headache," as he termed it, and it then occurred to him to procure some jexite for blasting, which he understood did not create any noxious fumes, though he had never before used any of it. He was somewhat familiar with the use of dynamite, though by no means an expert in its use, but was apparently unacquainted with the chemical properties of either explosive. He went to the store of the Usk Hardware Company and purchased five pounds of jexite. That firm kept jexite in stock for sale at retail, having purchased it from the National Powder Company. The conversation between respondent and the member of the firm who waited on him in the making of that sale was testified to by him as follows:

"Q. What conversation, if any, did you have with any of the firm of Greenhalgh Brothers, any of the Greenhalgh members of the Usk Hardware Company, prior to the making of the purchase of this powder?  A. I asked them if they handled jexite powder. I had heard of it, read of it; they said they did and while he was doing it up I asked him if it was handled the same as dynamite. He said, No, it wasn't, and went on and stated that it was a perfectly safe powder and that I could pound it with an iron or I could pound it on stone or that I could eat it; handle it most any way I wanted to, it could only be exploded by a cap. I told him I was putting it in a drill hole. He said, You can tamp it

in the drill hole with an iron or with most anything you happen to have in hand. Q. Did they make any statement to you at any time that this could be struck direct with a steel or iron bar, or anything of that kind? A. Yes, sir. Q. What was that statement? A. Why, that it could be tamped in a hole with an iron or anything else, a steel bar could be struck on it and it could be struck on a stone. Q. Now, Mr. Marsh, state what, if anything, was said to you by Mr. Greenhalgh with reference to the lighting or burning of this powder. A. He said I could light it with a match and it wouldn't explode. Well, the way I understood it, that it would not explode without a cap."

Jexite is put up for sale by the powder company in boxes marked only "High Explosive Jexite." These boxes contain small bags or packages on which there are no marks or printing of any kind indicating their contents. There were no marks or printing on the packages respondent purchased from the hardware company. Respondent describes the appearance of jexite as follows:

"Q. How did it look? A. Well, as I remember it, it looked about the same as chalk broken up, it was not as white as white chalk, but it was in granules the size of the end of my finger, from that down. As I remember, some of it was coarser, some of the packages was coarser than others, kind of bulky stuff."

Respondent then took the jexite he had purchased, and some caps which were furnished to him with it, to the well. He used two or three charges of it that day without any unusual results. On the day following, he attempted to use a charge of it which caused the injuries he complains of. He then drilled a hole in the bottom of the well about twenty inches deep, which when completed was about two inches in diameter at the bottom and from four to five inches in diameter at the top. This occurred from the use of an iron bar which, as the hole deepened, he would work around sideways, causing the hole to be reamed out at the top and become to some degree funnel shaped. He then began loading

the hole with jexite.   He testified as to his manner of doing this and the result as follows:

"Q. Just describe that operation.   A. Well, in the first place, I opened my package.   I had the man at the top let it down to me in the bucket.   I opened my package of powder and I poured some into the hole and it was of a character that was bulky and I thought that by taking the bar and tamping it a little I could get more powder in the hole and could make a better success, so I just took the bar and simply worked it down to get it into position, then I would pour some more in, then I would chuck that down with one hand, and I was doing that at the time it went off, after I had taken a look at it and I thought I would chuck it in the middle to make a little hole in the middle to put the cap in, as they said to just bury the cap in the powder, and by chucking that a little the powder would settle a little every time I hit it, and I chucked it in the middle and as I took particular aim and chucked it in the middle it went off and I was standing right over it and you can see the consequences.   Q. Take this bar and heft it, now don't drop it; feel that bar and see if that is the bar you used.   A. Yes—well, I couldn't say, of course I can't see it, but it feels like the crowbar.   Q. Feel the other end of it.   A. It feels like a crowbar, this is sure.   I have handled that several times.   Yes, I guess that is the very same bar; feels like it.   Q. Now, which end of this bar were you using?   A. I was using the small end, standing, as I said, about like this, and struck the center of the powder, to put in the center of the hole.   I gave it a chuck to put in the center of the hole, and it exploded, and course it—that is the last I ever—I didn't see anything more.   Q. Never have since?   A. No, never have since."

The bar was introduced in evidence.   The smaller end of it is about one inch in diameter for a distance of a foot or more from the end, tapering very slightly, and the extreme end, for a distance of about one and a half inches, tapers abruptly to a diameter of about a quarter of an inch, so that it may be designated as bluntly pointed.   This is the end respondent was using to settle the powder in the hole.   Respondent's injuries were not of a very serious or permanent nature, aside from the injury to his eyes resulting in his entire loss of

sight. While the concussion of the explosion threw him back from the hole, it is evident no pieces of earth or rock of any considerable size struck him. Some sand or grit was washed out of his eyes by the doctor. Considerable argument is indulged in by counsel as to whether this was an explosion or merely a burning of the powder. It was in any event a sudden and violent outbreak of physical force such as was fraught with danger to any one near it, and we think, for our present purpose, it was such as may be characterized as an explosion rather than a mere burning. Jexite is a new explosive, and it is plain that the powder company was manufacturing and putting it out to the public as such, with special claims as to its safety. A large amount of testimony was given relating to experiments in the use of jexite, bearing upon the conditions under which it would explode or ignite. The evidence offered by the appellants tended for the most part to show its action was constant under given conditions and that it could be depended upon, while the evidence introduced in behalf of respondents tended to show the contrary. We believe the foregoing to be a fair statement of the facts shown by this very voluminous record, which the jury were warranted in believing, and evidently did believe, and which are necessary to have before us in dealing with the several contentions of counsel for the respective parties.

We note at the outset the complaint of counsel for appellant that counsel for respondent invoke the law of negligence in this court. Should we confine ourselves to a technical view of the issues in the case, the basis of respondent's claim for damages might be regarded as resting strictly upon deceit, consisting of false representations made by appellants touching the safety of the jexite at the time of the purchase thereof by respondent. We think, however, that in view of the inherent dangers attending the use of such a high explosive, the element of negligence on the part of appellants in selling it to the public, and the giving to the public of

erroneous information as to its nature and the safe manner
of its use, enters into the case. The main question is what
would a reasonable man, possessing respondent's knowledge
of explosives in general, be induced to believe as to the safe
manner of handling and using this new explosive, from his
knowledge acquired by the circular issued by the powder
company and the conversation had at the time of the pur-
chase from the hardware company? It seems to us of but
little consequence here whether we regard the giving of this
information as technical deceit or as negligence, assuming
that it was the proximate cause of respondent's injury. Even
in an action resting upon a wrong growing out of a breach
of warranty contained in a contract of sale of an article in-
herently dangerous, the right of recovery may in a sense be
regarded as resting upon negligence on the part of the seller.
In harmony with this view, it is said in 3 Sutherland on
Damages (3d ed.), § 675:

"A buyer may recover damages for personal injuries which
result from selling property with a false warranty. A chem-
ist or druggist may be held liable for such injuries received
from deleterious compounds furnished which are unfit for the
purpose for which he professed to sell them. A dealer will
be liable for like injuries resulting from the explosion of illu-
minating oils sold with warranty, express or implied, which
is untrue, as will the manufacturer of a generator of acety-
lene gas who falsely warrants that the same will not explode.
And so will any vendor be held answerable for such injuries
from vicious animals, sold with warranty of gentle and docile
nature. In such cases there is a negligence which, though
free from fraud, involves a serious breach of social duty as
well as contract; and when the injury comes to the vendee from
an exposure induced by the warranty, doubtless the right to
damages in an action upon the warranty would be co-ex-
tensive with that allowed for compensation in actions for
negligence. Where an act of negligence is imminently dan-
gerous to the lives of others, the guilty party is liable to one
injured thereby whether a contract between them be violated
by that negligence or not."

We are led to make this observation at the outset, in view of the efforts of appellants' counsel to avoid the law of negligence invoked by counsel for respondent.

The principal contentions made by counsel for appellants are directed to the claimed error of the trial court in denying their challenge to the sufficiency of the evidence to support the verdict. These contentions having been made in behalf of certain of the appellants separately, we shall notice their claimed rights thereunder accordingly.

Does the evidence support the judgment as against the appellant National Powder Company? That company, we have seen, caused to be printed and sent out to the public generally the circular above quoted. While the circular does not state in detail any particular manner in which jexite may be used with safety, it is plain from the language therein used that the powder company intended to convey to the public the impression that the principal virtue of jexite was its safety above all other explosives, and that it could be safely used in ways different from other explosives. It would indeed be difficult to put forth in stronger and more comprehensive language claims as to the safety of jexite than this statement of the powder company. That company also put up jexite in packages for shipment and distribution for its customers, the retailers, marked only "High Explosive Jexite," which packages contained the smaller packages having no marks or printing thereon to designate their contents. It was evidently one or more of these packages that was acquired by respondent when he made his purchase from the hardware company. At the time of his conversation with the member of that company relative to the safety of jexite, the information then acquired by him through that conversation was somewhat more specific than the statements in the circular as to just what could safely be done with jexite; but when the comprehensive language of the circular issued by the powder company is considered, might not the jurors, as reasonable men, regard the statement of the member of the

hardware company in substance as no more comprehensive than the statement of the powder company contained in its circular? In other words, was not the jury warranted in believing that the powder company was as responsible for the information imparted by the hardware company as it was for the statements made in its own circular? Unless the statements made to respondent by the member of the hardware company did go beyond those made by the powder company in its circular, it would seem plain that the powder company could not escape responsibility upon the claim that it was being made to answer for the false representations of another. It is evident that the powder company intended the public to believe the statements made in its circular, and also intended its customers, the retailers, to give the public the information therein contained. It seems to us that, under all the circumstances shown, we cannot say, as a matter of law, that the hardware company was not authorized by the powder company to make the representations it did to the respondent at the time of the purchase. It is evident, in view of the instructions of the court in submitting the issues to the jury, that they believed that the hardware company was authorized by the powder company to make the representations it did to the respondent, and we do not feel warranted in concluding otherwise. It is true that this involves largely a question of the construction of language; but nevertheless, in view of the circumstances shown, we think it became a question of fact for the jury, rather than of law for the court, concerning which the minds of reasonable men might differ as to the meaning such language would convey to respondent as a prospective purchaser. We notice this relationship between the powder company and the hardware company because respondent's counsel seems to have proceeded upon the theory that the representations more particularly relied upon by respondent were those coming from the member of the hardware company at the time of the purchase of the jexite by respondent.

It is next in order to inquire: Was the information acquired by the respondent from the powder company circular and his conversation with the member of the hardware company at the time of his purchase such as to lead a reasonable man of respondent's knowledge to use the jexite in the manner which resulted in his injury? In other words, was this information so acquired by respondent the proximate cause of his injury? This, like the question of the authorization of the hardware company by the powder company to make the representations it did, it seems to us, is not a question which reasonable minds must necessarily arrive at the same conclusion upon, and, therefore, it also became a question for the jury to decide. These questions having been resolved in favor of the respondent by the jury, the liability of the powder company seems clear under well-settled rules of law, even though there were no contractual relations existing between it and respondent. In *Weiser v. Holzman*, 33 Wash. 87, 73 Pac. 797, 99 Am. St. 932, the rule of liability growing out of negligence in such cases is stated thus:

"One who sells and delivers to another an article intrinsically dangerous to human life or health, such as a poison, an explosive, or the like, knowing it to be such, without notice to the purchaser that it is intrinsically dangerous, is responsible to any person who is, without fault on his part, injured thereby.. The rule does not rest upon any principle of contract, or contractual relation existing between the person delivering the article and the person injured, for there is no contract or contractual relation between them. It rests on the principle that the original act of delivering the article is wrongful, and that every one is responsible for the natural consequences of his wrongful acts."

This, it is true, is the rule of negligence in the absence of any affirmative representations by the seller as to the safety of the thing sold, but we think that as a rule of liability for injuries following from the putting out of a dangerous article, such as an explosive or poison, it is equally applicable where there is an affirmative representation or guarantee as

to the safety of such article. *Thomas v. Winchester*, 6 N. Y. 397, 57 Am. Dec. 455; *Tyler v. Moody*, 111 Ky. 191, 63 S. W. 433, 98 Am. St. 406, 54 L. R. A. 417; *Huset v. Case Threshing Machine Co.*, 120 Fed. 865, 61 L. R. A. 303; *Watson v. Augusta Brewing Co.*, 124 Ga. 121, 52 S. E. 152, 110 Am. St. 157, 1 L. R. A. (N. S.) 1178; *Kuelling v. Roderick Lean Mfg. Co.*, 183 N. Y. 78, 75 N. E. 1098, 111 Am. St. 691, 2 L. R. A. (N. S.) 303; *Laudeman v. Russell & Co.*, 46 Ind. App. 32, 91 N. E. 822; *Keep v. National Tube Co.*, 154 Fed. 121; *Clement v. Crosby & Co.*, 148 Mich. 293, 111 N. W. 745, 10 L. R. A. (N. S.) 588.

Does the evidence support the judgment as against the Usk Hardware Company? In view of the fact that, at the time of the purchase of the jexite by respondent, the representations as to its safety were made by a member of that company direct to the respondent, what we have already said relative to the liability of the powder company, and the law cited in support thereof, seems to fully answer this question in respondent's favor. It is insisted, however, that the hardware company cannot be held, because there is no evidence that any of its members knew that the representations made to respondent at the time of the purchase of the jexite were false. It seems to us that the inherently dangerous character of this powerful explosive is of itself enough to warrant the conclusion that the members of the hardware company were bound to know the dangers attending its handling and use. They were, at least, charged with the consequences of their affirmative statements as to the safe manner of using it. While we have noticed that the Usk Hardware Company was evidently prompted to make the representations by the statements made in the circular issued by the powder company, still their representations were made in such form as to become their own statements. They did not assume merely to convey to respondent the information as coming from the powder company, but made the representations as their own. This, in any event, made them responsi-

ble for all the consequences flowing therefrom. We are of the opinion that the hardware company cannot escape liability because of want of affirmative proof of their want of knowledge of the falsity of their representations.

It is contended that respondent cannot recover in this action because the evidence shows that whatever wrongs were committed by the powder company and the hardware company were the separate acts of each, and that even though such acts may have subsequently united in producing the injury, respondent cannot recover in an action prosecuted against them jointly. It might well be argued here that, because of the relationship of the hardware company to the powder company, the representations made by them and leading to the respondent's injury were not wholly the separate acts of each. It is true that the hardware company was not disposing of the jexite as agent for the powder company, in so far as the mere ownership of the jexite is concerned, but it is evident that both in a sense had a common interest in promoting the sale of the jexite and in enlarging the market therefor. The powder company was working to that end by the issuance of the circular, while the hardware company was working to the same end when its member made the representations to respondent. In the case of *Boston & Albany R. Co. v. Shanly,* 107 Mass. 568, there was involved the question of joint liability of two shippers of explosives, who, independently of each other, simultaneously delivered to the railroad company shipments of explosives in packages not marked so as to indicate their contents, but in apparently harmless packages. They were stored together for shipment, and while being transported, simultaneously exploded, causing injury for which the railroad company sued both shippers, resulting in the holding that both were liable and could be sued in the same action. At page 578, the court said:

"In this case, the acts of the parties who wrongfully sent the dangerous substances were contributory to the catastro-

phe, as much as if they had separately contributed to the rais-
ing of a pile of offal which occasioned an offensive odor, or had
at one time separately fired a building by distinct torches,
each of which contributed to a conflagration of the whole.   It
cannot be, that, because the several wrongdoers have so con-
tributed to the injury that it is impossible to distinguish
what portion of it was caused by each, therefore they can
escape with impunity.   On the contrary, each is liable for the
whole.   The case is similar to *Stone v. Dickinson*, 5 Allen 29,
and 7 Allen 26, where several creditors of Stone brought
actions against him, and each caused him to be imprisoned
for the same space of time.   The injury being one, it was
held that, though there had been no concert between them,
he could maintain one action against all, and each was liable
for the whole damage.   The same doctrine was held in *Ellis v.
Howard*, 17 Verm. 330.

"The many ways in which wrongdoers may injure another
give rise to some nice distinctions; but when their several
acts directly contribute to produce a single injury, each
being sufficient to have caused the whole, and it is impossible
to distinguish the portions of injury caused by each, that
concurrence ought to render each of them liable for the
whole in a joint action.   On this ground, the manufacturers
who sent the articles are jointly liable in this action."

This would be authority in support of respondent's con-
tention here, even if we regarded the acts of the hardware
company and the powder company as wholly unrelated other
than by thereafter uniting to cause respondent's injury.
There seems to be a lack of harmony in the decisions touching
the question of joint liability where the acts of several joint
wrongdoers are wholly unrelated to each other.   See note,
*Day v. Louisville Coal & Coke Co.*, 10 L. R. A. (N. S.) 167.
We deem it unnecessary to decide the question here presented
from the viewpoint of wholly unrelated acts of torts, since,
as we have seen, the powder company and the hardware com-
pany were in a sense acting to a common end in making the
representations as to the safety of the jexite; that is, to the
end that the sale of jexite would be increased and its market

extended.   Mr. Freeman, in his note to *Village of Carterville v. Cook,* 16 Am. St. 250, observes:

"When one act of negligence unites with another and like act, or with any other cause, in inflicting injury upon the person or property of another, whose negligence has not also contributed to his injury, and there exists no means of determining the extent to which the injury resulted from either negligent act, it is obvious that each person guilty of negligence must either be held entirely exonerated, or as answerable for the whole damages inflicted in part by his negligence.   In all instances in which his negligence can be regarded as the proximate cause, or as one of the proximate causes, of an injury, he is answerable for the whole thereof, either separately or jointly and severally with any other person whose negligence or wrongful act may also have been one of the proximate causes of such injury."

See, also, *Clement v. Crosby & Co.,* 148 Mich. 293, 111 N. W. 745, 10 L. R. A. (N. S.) 588.

We think that the facts warrant the conclusion that both the powder company and the hardware company are jointly and severally liable for respondent's injuries, for which he may recover in this action.

It is contended that in no event can appellants Drumheller and Coolidge, president and secretary of the powder company, be held personally liable for respondent's injuries. This contention is evidently made upon the theory that the putting out of the circular was the act of the corporation alone.   We have noticed that these appellants were both trustees of the powder company, that that company had no general manager, and therefore that both of them were presumed to have been actively engaged in managing the affairs of the company.   No evidence was offered to rebut this presumption.   We think it follows that the act of the company in issuing the circular was also in law the personal act of these trustees, in so far as such act constituted the wrong resulting in respondent's injury.   In *Nunnelly v. Southern Iron Co.,*  94 Tenn. 397, 29 S. W. 361, 28 L. R. A. 421, the

court, at page 429, 28 L. R. A., dealing with the personal liability of the officers of a corporation in such cases, uses this vigorous language:

"When a person enters into a contract with a corporation, through its agents or officers, fairly and in good faith, there can, under no circumstances, any liability attach to such agents or officers in respect to the contract, unless so stipulated. In such a case the person gets just what he bargained for,—a liability against or a contract with a corporation alone. But the torts or wrongs of corporations through its agents or officers are governed by an entirely different principle of law. If the agent of a corporation or of an individual commits a tort, the agent is clearly liable for the same; and it matters not what liability may attach to the principal for the tort, the agent must respond in damages if called upon to do so. This principle is absolutely without exception, is founded upon the soundest legal analogies, and the wisest public policy. It is sanctioned by both reason and justice, and commends itself to every enlightened conscience. To permit an agent of a corporation, in carrying on its business, to inflict wrong and injury upon others, and then shield himself from liability behind his vicarious character, would often both sanction and encourage the perpetration of flagrant and wanton injuries by agents of insolvent and irresponsible corporations."

This view also finds support in the following decisions: *Lough v. John Davis & Co.*, 30 Wash. 204, 70 Pac. 491, 94 Am. St. 848, 59 L. R. A. 802; *Lytle Logging & Mercantile Co. v. Humptulips Driving Co.*, 60 Wash. 559, 111 Pac. 774; *Cameron v. Kenyon-Connell Commercial Co.*, 22 Mont. 312, 56 Pac. 358, 74 Am. St. 602, 44 L. R. A. 508. We are of the opinion that the evidence supports the verdict and judgment as against these officers, as well as against the powder company.

It is contended that respondent's injury was the result of his own contributory negligence, to the extent that appellants cannot be held liable therefor. While a somewhat plausible argument can be made in support of this contention, based upon what may seem carelessness on the part of

respondent in using the iron bar to tamp or settle the jexite ·
in the drill hole, yet in view of the representations made
by the powder company and the hardware company and the
information thereby acquired by respondent, we cannot say
that the minds of reasonable men might not differ in their
conclusion as to the degree of care he should have exercised
in the use of the jexite. Like the question of the negligence
of the powder company and the hardware company in putting
out this new explosive, and their representations concerning
its safety, this, we think, became a question of fact for the
jury.

Some contention is made upon the rulings of the court
concerning the admission and rejection of evidence, and in
permitting and restraining experiments with jexite in the
presence of the jury during the progress of the trial. We
deem it sufficient to say, relative to these contentions, that
they all have to do with questions of discretion on the part
of the court, which discretion we think was not abused.

The verdict of twenty thousand dollars is assailed as be-
ing excessive. It appears that respondent, at the time of
the injuries, was about thirty-five years old, and then had an
expectancy of life of about thirty-one years. He then had
an earning capacity of two dollars and fifty cents to three
dollars per day. If the amount which he was entitled to re-
cover were measured wholly by his loss of earning power,
there would be little difficulty in saying that the verdict is
excessive in amount. But when it is remembered that his in-
jury consisted of the entire loss of his sight, we think it
cannot be said that the verdict is excessive. It is indeed
difficult to conceive of an injury more serious than this. He
is not only entirely deprived of his earning power, but of
that sense which all will probably agree contributes more to
life's enjoyment than any other. Comparing the size of this
verdict with other large verdicts heretofore upheld by this
court, we think it cannot be said that our declining to inter-
fere with it is inconsistent with our former holdings. *Sears*

*v. Seattle Consol. St. R. Co.*, 6 Wash. 227, 33 Pac. 389, 1081; *Sutton v. Snohomish*, 11 Wash. 24, 39 Pac. 273, 48 Am. St. 847; *Smith v. Spokane*, 16 Wash. 403, 47 Pac. 888; *Durham v. Spokane*, 27 Wash. 615, 68 Pac. 383; *Williams v. Spokane Falls & N. R. Co.*, 42 Wash. 597, 84 Pac. 1129; *Haggard v. Seattle*, 61 Wash. 499, 112 Pac. 503.

We conclude that the record fails to show any prejudicial error committed against the appellants. The difficult questions here involved we regard as questions of fact, as to all of which there is, we think, room for honest difference of opinion. For us to interfere with the verdict would, in our opinion, be to invade the province of the jury.

The judgment is affirmed.

CROW, C. J., MAIN, ELLIS, and GOSE, JJ., concur.

FULLERTON, J., dissents.