**Florence WRIGHT and Roy Wright, Plaintiffs-Appellants,**

v.

**CARTER PRODUCTS, Inc., Defendant-Appellee.**

**No. 161, Docket 24256.**

United States Court of Appeals Second Circuit.

Submitted Jan. 22, 1957.

Decided May 1, 1957.

---

Budd, Quencer & Commette, New York City (Albert S. Commette, New York City, of counsel), for plaintiffs-appellants.

William S. O'Connor, New York City (Leonard Garment, New York City, of counsel), for defendant-appellee.

Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

The plaintiffs, Florence and Roy Wright, appeal from a judgment below dismissing their complaint and awarding judgment to the defendant. Florence sought damages for personal injuries suffered by her from the application of a deodorant and anti-perspirant manufactured by the defendant and distributed under the tradename "Arrid." Roy, her husband, sought recovery for medical expenses and damages for loss of services.

Mrs. Wright, a resident of Belmont, Massachusetts, had used Arrid two or three times a week for approximately five years prior to June 1951 without suffering any ill effects. In June 1951 she bought a jar of Arrid at a nearby store, used it once, and immediately thereafter contracted a rash in both armpits. Although the rash soon subsided, Mrs. Wright discontinued the use of this

deodorant for several months until late October or early November 1951, when she again applied Arrid, using the same jar that she had purchased in June. No harmful effects resulted from this application. Later, in the latter part of November, she again used Arrid from this jar. As a result of this last application Mrs. Wright sustained a severe case of contact dermatitis, which initially was confined to an eruption in both armpits but later spread to her arms, and on occasion, to other parts of her body. This condition can be ameliorated by treatment, but unless continually treated it tends to be reactivated.

At the trial it was conceded that Arrid contains aluminum sulfate. This ingredient is an astringent that causes the pores of the skin to close for a period of time. Perspiration is thus temporarily reduced. The plaintiffs introduced expert testimony and other evidence tending to show that some individuals are allergic to aluminum sulfate. When applied to the skin of such persons it will cause contact dermatitis in varying degrees of severity. The plaintiffs also established that for at least three years prior to Mrs. Wright's purchase in June 1951, the defendant had advertised that Arrid was "safe," "harmless," and "would not irritate the skin."

Evidence was also introduced tending to establish that prior to June 1951 the defendant was aware of this peculiar property of its product, for in the four years from 1948 to 1951, the defendant, according to its own files, had received 373 complaints of skin irritation allegedly caused by Arrid. During this same period, however, the defendant had sold over 82,000,000 jars. The plaintiffs also attempted unsuccessfully to introduce findings of the Federal Trade Commission, affirmed by a court of appeals prior to Mrs. Wright's purchase in 1951, to the effect that the use of Arrid will cause dermatitis in some people.[1]

No evidence was adduced at the trial to show that the defendant was negligent in the preparation of the particular batch of Arrid that precipitated Mrs. Wright's condition. Thus the trial court concluded that the only issue of negligence presented was whether the mere use of aluminum sulfate in Arrid was sufficient to charge the manufacturer with liability to these plaintiffs when no warning was given by it of the possible harmful effect that Arrid might have to a very small proportion of the potential users of that deodorant.

Relying on the statistical infrequency of injury caused by the use of Arrid, the trial court held that the defendant was not negligent, and that "the injury suffered by the plaintiff was the result of her own allergy rather than being caused by any inherent defect in the product itself." The court below apparently believed, since the evidence before it indicated that only a minuscule percentage of potential customers could be endangered by using Arrid, that the defendant was under no duty to warn of any harmful propensities the product might have despite the defendant's own knowledge thereof.

With such a conclusion we cannot agree, for we believe that duties to warn are not, in all cases, measured by solely quantitative standards. We believe that the trial court erred in defining the scope of this defendant-manufacturer's liability, and we remand the case for further findings in the light of our discussion herein.

I

*The Duty to Warn.*

Because federal jurisdiction in this case was based solely on diversity of citizenship, the trial court was required to apply the substantive law of the state in which it sat, *i. e.,* New York. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. But conflict of laws principles are substantive for Erie purposes, Klaxon Co. v. Stentor Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, and, according to the conflict of laws rules of New York, the

1. See Carter Products, Inc. v. F. T. C., 7 Cir., 1951, 186 F.2d 821, 827.

applicable law of torts is that of the place of wrong. Conklin v. Canadian-Colonial Airways, 1935, 266 N.Y. 244, 194 N.E. 692. Thus the trial court properly looked to the local law of Massachusetts to determine the nature and extent of the plaintiffs' rights.

In Massachusetts a remote vendee can recover damages from a manufacturer for injuries sustained as the result of using a manufacturer's product if negligence is shown on the part of the manufacturer either in the utilization of its formula or in the concoction of the particular batch of the product involved. Carter v. Yardley & Co., 1946, 319 Mass. 92, 64 N.E.2d 693, 695, 164 A.L.R. 559. In finding the defendant free of negligence within the meaning of this rule, the trial court held that recovery is not available if " * * * injury to the plaintiff was caused * * * by her own peculiar and unforeseeable susceptibility," quoting the Yardley case, supra, or if the product was " * * * merely unfit for use by one who was constitutionally unable to use [the product] because of a supersensitive skin," quoting Graham v. Jordan Marsh Co., 1946, 319 Mass. 690, 693, 67 N.E.2d 404, 405. But as applied to the facts of the case at bar, reliance on these two decisions would appear to be misplaced. The full reasoning of the Yardley opinion bears out our belief that the crucial word in the language quoted from that decision is "unforeseeable." For example, the Massachusetts court there stated:

"The defendant could not be found negligent unless injury to the skin of a consumer from the contents of the bottle *was to be anticipated*." (Emphasis added.) 319 Mass. at page 94, 67 N.E.2d at page 694.

Thus the statistical analysis of injury so heavily relied upon by the trial court would seem relevant only to the issue of foreseeability to the manufacturer of injury to its potential patrons. In Massachusetts foreseeability of harm has been for many years the determinative element in ascertaining the scope of a manufacturer's liability. In Gould v. Slater Woolen Co., 1888, 147 Mass. 315, 317, 17 N.E. 531, 532, in finding for a defendant manufacturer who had been sued for injuries resulting from a dye used in its product, the court based its decision on the following reasoning:

"All that the plaintiff showed against the defendant was that it used an article for dyeing its cloths which was the most common mordant used in wool dyeing * * * which, *so far as then known,* had *never* caused injury to anybody who merely handled the cloths, and which *the defendant did not know or suppose, and had no reason to know or suppose, to be injurious;* and under these circumstances, although there was evidence tending to show that, in point of fact, the plaintiff was injured by merely handling the cloths, *this was not a result which the defendant was bound or ought to have contemplated as likely to happen.*" (Emphasis added.)

The rationale of the Gould case was reaffirmed in another context by the highest court of Massachusetts as late as 1945, when, on a different set of facts, judgment for the plaintiff was sustained. In Taylor v. Newcomb Baking Co., 1945, 317 Mass. 609, 611, 59 N.E.2d 293, 294, the plaintiff, a dishwasher employed by the defendant, had contracted severe dermatitis from the use of "strong" soap prescribed by his employer for performing his duties. The court, in upholding a jury verdict, reasoned as follows:

"It could have been found that the defendant knew or ought to have known that this 'strong' soap powder which had caused trouble before might cause trouble again, and that it knew or ought to have known whatever is 'known to be common amongst the trade,' to wit, that the soap powder was a possible source of danger to a class of persons of whom the plaintiff might be one. It is not necessary that the majority of possible employees be susceptible. It is enough if a sufficient number are

susceptible so that a jury could reasonably say that *the defendant ought to have known and recognized the danger of injury and ought to have guarded against it.*" (Emphasis added.)

Although the defendant in the Taylor case was sued as an employer, rather than as a manufacturer, we think the reasoning of that decision is applicable to the case at bar. Perhaps the best statement of the correct law we believe to govern the issue now before us appeared in an old, but enlightened, Michigan decision:

"When the fact is once established and demonstrated by experience that a certain commodity apparently harmless, contains concealed dangers, and when distributed to the public through the channels of trade and used for the purposes for which it was made and sold is sure to cause suffering to, and injure the health of, some innocent purchaser, even though the percentage of those injured be not large, a duty arises to and a responsibility rests upon the manufacturer and dealer with knowledge to the extent, at least, of warning the ignorant consumer * * *". Gerkin v. Brown & Sehler Co., 1913, 177 Mich. 45, 60, 143 N.W. 48, 53, 48 L.R.A.,N.S., 224.

We think that Massachusetts has taken a similar position with respect to manufacturer's liability.[2]

■■■■ We are therefore remanding this case to the trial court for it to consider (1) whether, in the exercise of reasonable precaution, this defendant in 1951 could have foreseen that at least some of the potential users of Arrid would suffer serious injury from the use of that product, and (2) whether this defendant had a duty to warn those users of that possible injury. It would seem that a manufacturer cannot be required to alter a formula that has proven safe for use by the overwhelming majority of its users, but the standard of care owed by that manufacturer to its ultimate consumers may include a duty to warn those few persons who it knows cannot apply its product without serious injury.[3] See Dickerson, Products Liability and the Food Consumer, §§ 4.26–4.28 (1951); Dilliard & Hart, Product Liability: Directions for Use and Duty to Warn, 41 Va.L.Rev. 145

---

2. See Dickerson, Products Liability and the Food Consumer, p. 222 (1951). Cf. Sylvania Electric Products, Inc. v. Barker, 1 Cir., 1955, 228 F.2d 842. In Graham v. Jordan Marsh Co., 1946, 319 Mass. 690, 67 N.E.2d 404, the plaintiff, who had been injured by the use of cold cream, was suing the retailer from whom she bought the jar, not the manufacturer, on the theory of breach of an implied warranty of fitness for a particular use. A retailer, who obviously cannot be held to the knowledge of an expert for the chemical propensities of a sealed brand name cosmetic sold over its counters but never analyzed by it, impliedly warrants only that the product is fit for use by people of so-called "normal" skin. Unless the risk of injury is otherwise made known to it, the retailer cannot *foresee* the possibility of harm that may ensue from the use of such a product. This distinction between the scope of a retailer's usual liability and that of a manufacturer is perhaps illustrated by the case of Bianchi v. Denholm & McKay Co., 1939, 302

Mass. 469, 19 N.E.2d 697, 699, 121 A.L.R. 460, where a verdict for the plaintiff in a suit against a retailer for injuries resulting from the use of a certain face powder was affirmed on appeal. There the retailer was found to be liable because it sold a cosmetic that contained "a *known* irritant to 'some' persons' skins." (Emphasis added.) Hence in that case it was foreseeable, even to a retailer, that some potential customers would be injured by the product if they were not warned of its effects on sensitive skin.

3. See Merrill v. Beaute Vues Corp., 10 Cir., 1956, 235 F.2d 893, 898–900 (Murrah, J., concurring).

"If the law is to keep apace of the socialistic problems wrought by science and technology, it is high time for the courts to also recognize the allergic or unusually susceptible as *members* of a legally identifiable class, to whom the law will extend its protection in warranty and in tort, and not as isolated individuals of whom the law takes no account." 235 F.2d at page 899.

(1955). Liability in negligence for the failure to discharge that duty by inserting appropriate words of caution is rightly borne as one of the costs of producing and selling a commodity for use by members of the public whose knowledge of potential danger to themselves may be greatly inferior to that possessed by the manufacturer. Cf. Rosenbusch v. Ambrosia Milk Corp., 1st Dept. 1917, 181 App.Div. 97, 168 N.Y.S. 505; Henry v. Crook, 3d Dept. 1922, 202 App.Div. 19, 195 N.Y.S. 642. Thus, in addition to the incidence of sensitivity to aluminum sulfate, the trial court should also consider the gravity of the possible injury from the use of Arrid and the difficulty, if any, of embodying an effective precaution in the labels or literature attached to the product. In ascertaining the standard of care owed by the defendant to the ultimate consumers of Arrid, the trial court should also take into consideration the defendant's status as an expert in the formulation and use of chemicals for deodorant purposes. See Harper & James, The Law of Torts, §§ 28.8, 28.9 (1956).

The defendant's status as an expert would thus seem doubly relevant: (1) as bearing on its duty to communicate its superior knowledge to those who, because of their own limited information, would otherwise be unable to protect themselves, and (2) as tending to show that the defendant knew, or should have known, of the possible harm that might befall some users of its product.

Other evidence tended to establish the defendant's actual knowledge of the threat of injury to some consumers.

The defendant had received 373 complaints in the four years from 1948 to 1951. It had also been the object of an FTC order affirmed by the reviewing court of appeals prior to Mrs. Wright's purchase in 1951. Once the plaintiffs had introduced competent evidence tending to prove that Mrs. Wright and other people are allergic to aluminum sulfate, the trial court should then have admitted the FTC findings, as affirmed, solely on the issue of the defendant's knowledge of the possible harmful propensities of its product.[4]

Although not considered below, or raised upon appeal, we would point out that the plaintiffs may be entitled to the benefit of a presumption that the defendant was aware of the possibility of injury from the use of its product. "In Massachusetts the rule seems to be that every manufacturer is presumed to know the nature and qualities of his products. * * * Thus, once a plaintiff establishes in a Massachusetts court that a manufacturer-defendant's product is dangerous in its ordinary use and that no warning of its danger was given, a presumption of the defendant's knowledge of the danger arises, and this presumption with, of course, proof of causation and injury, completes the plaintiff's *prima facie* case. Hence in Massachusetts it is up to a manufacturer-defendant to come forward, if it can, with exculpatory evidence of its faultless ignorance of the dangers of its product to those who might use it." Sylvania Electric Products, Inc. v. Barker, 1 Cir., 1955, 228 F.2d 842, 848–49, certiorari

4. In Carter Products, Inc., v. F. T. C., 7 Cir., 1951, 186 F.2d 821, 827, the court wrote:

"The evidence proved that Arrid had caused and may cause injury to a number of people, and that such injury is not confined to persons having allergies or idiosyncracies. One medical expert testified that during the course of ten years he had treated fifty cases of dermatitis proved to have been caused by Arrid. There was, therefore, substantial evidence sustaining the finding, 'This preparation is not harmless, and its use will

cause skin irritations, and dermatitis in some people.'"

Since this finding was made in a controversy between different parties and at an administrative hearing conducted according to its own rules of evidence, it is admissible in the suit at bar only on the issue of notice and not as evidence of the fact of Arrid's propensities. Cf. Brunswick-Balke-Collender Co. v. American Bowling & Billiard Corp., 2 Cir., 1949, 150 F.2d 69, 74; Proper v. John Bene & Sons, D.C.N.Y.1923, 295 F. 729, 731–32.

denied, 1956, 350 U.S. 988, 76 S.Ct. 475, 100 L.Ed. 854.

Since the trial court must apply the New York rule of conflict of laws, Klaxon Co. v. Stentor Co., supra, it will be necessary for it to determine whether under the law of New York this Massachusetts "presumption" is substantive or procedural for conflict of laws purposes.

The First Circuit treated the Massachusetts presumption as a rule for the allocation of the burden of proof. That court then held this presumption "procedural" for conflict of laws purposes, relying on several decisions so characterizing the burden of proving contributory negligence. See Sylvania Electric Products, Inc. v. Barker, supra, 228 F.2d at pages 849–50. In our own search we have found no New York cases discussing the proper characterization of a presumption such as this, which would seem to us to be almost an integral part of a substantive rule of tort liability. We have noted, however, two lower court opinions treating the burden of proving contributory negligence as procedural for conflict of laws purposes, at least in non-statutory negligence actions. Clark v. Harnischfeger Sales Corp., 2d Dept. 1933, 238 App.Div. 493, 264 N.Y.S. 873; Wright v. Palmison, 2d Dept. 1932, 237 App.Div. 22, 260 N.Y.S. 812. See Palmer v. Hoffman, 1943, 318 U.S. 109, 117–119, 63 S.Ct. 477, 87 L.Ed. 645; Lobel v. American Airlines, Inc., 2d Cir., 1951, 192 F.2d 217, 219. The wisdom of these New York decisions may be open to question, inasmuch as the burden of proof has been held to be substantive for purposes of Erie v. Tompkins, supra. Cities Service Oil Co. v. Dunlap, 1939, 308 U. S. 208, 60 S.Ct. 201, 84 L.Ed. 196; Palmer v. Hoffman, 1943, 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645; Sampson v. Channell, 1 Cir., 1940, 110 F.2d 754, 128 A.L.R. 394, certiorari denied 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415. Cf. Central Vermont Ry. Co. v. White,

1915, 238 U.S. 507, 35 S.Ct. 865, 59 L. Ed. 1433. The rationale of the Erie decision and conflict of laws rules have a common objective: a uniformity of result regardless of the forum in which a controversy is litigated. Therefore, as Judge Magruder pointed out in his very learned opinion in Sampson v. Channell, "because of the influence which the incidence of burden of proof often has on the outcome of litigation, the better view would seem to be that in these conflict of laws cases, the forum should apply the rule of the locus delicti as to burden of proof." Sampson v. Channell, supra, 110 F.2d at page 755 note 2.

## II

*Contributory Negligence and Assumption of Risk.*

██ The trial court, after finding that the defendant was free from negligence, further wrote: "Even if it were found that the defendant was negligent, there would be no liability because of the contributory negligence of the plaintiff." In support of this conclusion, the court pointed out that Mrs. Wright had resumed the use of Arrid after she had once contracted a rash from its application in June 1951. Therefore, "By voluntarily exposing herself to the admittedly known risk, she precluded herself from any recovery from resulting injuries."

Again, we believe the trial court misapplied the concepts of contributory negligence and of assumption of risk to the facts of this case. As has been pointed out by two discerning commentators, "Though these time-honored defenses are frequently invoked to defeat recovery, they are theoretically inapplicable when the defendant's breach of duty is based on failure to warn. To allow these defenses is to indulge in circular reasoning, since usually the plaintiff cannot be said to have assumed a risk of which he was ignorant or to have contributed to his own injury when he had no way of reasonably ascertaining that

the danger of injury existed."[5] In the case at bar, Mrs. Wright had used Arrid regularly for five years without mishap. Then after one particular application she noticed a slight rash under her arms. She discontinued the use of this deodorant for several months, but on resuming its use she at first suffered no ill effects. A second application several days later precipitated the serious injury for which she now seeks recovery. In view of (1) her long and satisfactory experience with Arrid before the occurrence of the first rash, (2) her apparently harmless use of Arrid on the first application subsequent to contracting the rash, (3) her justifiable reliance on the defendant's well publicized assertions of the "harmless" nature of its product, and (4) the relative unfamiliarity of the average housewife with the chemical mysteries of the cosmetics applied periodically to her person, we do not agree with the finding that Mrs. Wright assumed the risk of her injury or contributed negligently to its occurrence.

### III

*False Advertising.*

Because we are remanding this case, we think it advisable to direct the attention of the trial court to several questions that were not discussed in the opinion below, but which we think it may well be required to consider on remand.

The plaintiffs were permitted to amend their original complaint to include the additional allegation that "the defendant misrepresented and falsely advertised its product so that prospective users of Arrid, including this plaintiff, were deceived, misinformed and misled into using said product." Although this claim appears to sound in fraud, the parties and the trial court apparently treated the allegation below as merely an amendment to, or amplification of, the original theory of negligence sued upon. Such treatment may have been thought necessary by the plaintiffs in order to withstand the defendant's charge that this claim was barred by the statute of limitations.[6]

In any event, there is some authority in other jurisdictions for grounding recovery upon a claim of negligent advertising.[7] Although our attention has not been directed to any Massachusetts cases espousing this particular theory of recovery, the plaintiffs, as possible bases for granting them relief, do rely upon two Massachusetts statutes, which prohibit false advertising[8] and misbranding.[9] They contend that the defendant violated those statutes by advertising and labeling its product as "safe," "harmless," and "does not irritate the skin."

It is well established that a statutory violation may be the basis for civil liability if the injured person is a member of the class for whose express benefit the statute was enacted and the harm resulting from the violation is of the type that the statute was designed to prevent. See 2 Restatement, Torts § 286 (1934); Prosser, Torts, p. 274 (1941). Apparently in Massachusetts the violation of such a statute is at least some evidence of negligence "on the part

5. Dilliard & Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 163 (1955).

6. If the amended complaint in truth added a new cause of action sounding in fraud, the timeliness of that action would be governed by six-year, rather than three-year, statutes of limitations, running from the date of the discovery of the fraud. N.Y.Civ.Prac.Act, § 48(5); Mass. Ann.Laws, c. 260, § 2 (1956).

7. See, e. g., Crist v. Art Metal Works, 1st Dept. 1930, 230 App.Div. 114, 243 N.Y.S. 496 ("absolutely harmless" toy gun); Henry v. Crook, 3d Dept. 1922, 202 App.Div. 19, 195 N.Y.S. 642 ("harmless" sparklers); Rosenbusch v. Ambrosia Milk Corp., 1st Dept. 1917, 181 App.Div. 97, 168 N.Y.S. 505 ("absolutely safe" dried milk product); Marsh v. Usk Hardware Co., 1913, 73 Wash. 543, 132 P. 241 ("absolutely safe" explosive); cf. E. I. DuPont de Nemours v. Baridon, 8 Cir., 1934, 73 F.2d 26. See Dickerson, Products Liability and the Food Consumer, p. 133 n. 2 (1951); Note, 22 Wash.U.L.Q. 406, 410 (1937).

8. Mass.Ann.Laws, c. 266, § 91 (1956).

9. Mass.Ann.Laws, c. 94, § 187 (1954).

of the violator as to all consequences that the statute * * * was intended to prevent." Guinan v. Famous Players-Lasky Corp., 1929, 267 Mass. 501, 516, 167 N.E. 235, 242; Carroll v. Cambridge Electric Light Co., 1942, 312 Mass. 89, 43 N.E.2d 340. Of course, the plaintiff must show a causal connection between the statutory violation and his injury in order to recover from the violator. Fulton v. Edison Electric Illuminating Co., 1939, 303 Mass. 258, 21 N.E.2d 609; Carroll v. Cambridge Electric Light Co., supra. But where a statute was enacted to protect a specific class of persons from their own inability to exercise self-protective care against the risks created by the violation of the statute, some courts hold that contributory negligence is no defense. See, e. g., Koenig v. Patrick Const. Corp., 1948, 298 N.Y. 313, 317, 83 N.E.2d 133, 134, 10 A.L.R.2d 848; 2 Restatement, Torts § 483 (1934). In the ordinary case of a statutory violation, however, negligence on the part of the plaintiff or his voluntary assumption of the risk will bar recovery. See Prosser, Torts, p. 274 (1941) and cases cited therein. This position was early adopted in Massachusetts, see Keenan v. Edison Electric Illuminating Co., 1893, 159 Mass. 379, 34 N.E. 366 (per Holmes, J.), and may still be law of that jurisdiction today. Of course, the trial court upon remand will never reach this question unless it first finds: (1) that the defendant violated the Massachusetts false advertising statute or the misbranding statute; (2) that Mrs. Wright, as an ultimate consumer of cosmetics, is a member of the class for whose express benefit that statute was enacted; (3) that her injury resulted from this violation and was of the type that the statute was designed to prevent; and (4) that she was contributorily negligent by resuming the use of Arrid after once contracting a rash from its application.

In the opinion below the trial court did not discuss the possible issues posed by the allegation of defendant's false advertising and reliance by Mrs. Wright thereon. On remand, we believe that the trial court should consider this claim, whether it be in negligence or fraud, and make appropriate findings in the light of the legal principles here set forth.

## IV

*Proximate Cause.*

The defendant has vigorously denied throughout this litigation that it breached any duty to warn, or that its advertising violated any statutory mandate. But in the event that such a breach or violation be found to have occurred, the defendant insists that neither could have been the "proximate" cause of Mrs. Wright's injury. The defendant points out that Mrs. Wright began using Arrid several years before she claims to have been aware of any advertisements of the deodorant's harmless nature. And attention has been directed to the label of the particular jar purchased in June 1951, which announced that its contents were "Safe For Normal Skin."

But to find the necessary legal causation in the defendant's acts, or failure to act, it is sufficient if Mrs. Wright's *continued* use of Arrid was in reliance on the defendant's assertions of safety, particularly after she had once experienced a rash from the application of this deodorant. Quite typically, she may have been willing to accept the assurance of the manufacturer, who held himself out as an expert, rather than rely on her own unscientific judgment, which was derived from a single unsuccessful experience in over five years of use. Furthermore, the plaintiff testified that she read the label on the jar purchased in June 1951, and that until the outbreak of her dermatitis she had no reason to believe that her skin was anything but "normal."

Nor is it essential to recovery that Mrs. Wright prove that her reliance upon the defendant's assurances of safety was based on any single, specific advertisement or label. In an age when corporate beauticians daily proclaim the

virtues of their products through every known medium of communication, it would seem sufficient for this plaintiff to establish that the defendant's repeated assertions of safety came to her attention and that she relied upon them.

## V

*Statute of Limitations.*

 Lastly, the defendant asserts that the plaintiffs' claim, at least to the extent that it sounds in negligence, was barred by the three-year New York statute of limitations.[10] The first serious outbreak of dermatitis suffered by Mrs. Wright occurred during the latter part of November 1951, a little less than three years before suit was initiated.[11] But the defendant has directed our attention to the testimony of one of the plaintiffs' own expert witnesses to the effect that "it takes time for an allergic reaction to develop in certain individuals." It is then argued that the plaintiffs' cause of action, if any, must have accrued as of the first application of Arrid by Mrs. Wright in 1946. Pushed to its logical extreme, this theory would indicate that whatever right to recovery Mrs. Wright may have possessed became stale after 1949, two years before she suffered any discernible injury.

Alternatively the defendant argues that its liability, if any, was fixed as of June 1951, at the latest, upon the appearance of the first rash, and thus the statute began to run from that date. In support of this contention the defendant relies on Schmidt v. Merchants Despatch Trans. Co., 1936, 270 N.Y. 287, 200 N.E. 824, 827, 104 A.L.R. 450. There the plaintiff alleged that, while in the employ of the defendant, he inhaled foreign substances in the form of dust and, as a result, contracted a disease of the lungs known as pneumoconiosis. In holding the statute of limitations a bar to recovery, the court declared that "the injury to the plaintiff was complete when the alleged negligence of the defendant caused the plaintiff to inhale

the deleterious dust," because "the disease resulted naturally, if not inevitably, from a condition created in the plaintiff's body through the defendant's alleged wrong." Thus in the Schmidt case the court assumed that once the plaintiff inhaled the harmful dust, he would eventually contract a lung disease, absent some intervening steps of prevention or other "good fortune." On the basis of the record before us, we are not prepared to draw the same medical conclusions about Mrs. Wright's affliction. Indeed, there is substantial support for the belief that the plaintiff would never have contracted a severe case of dermatitis if she had not applied Arrid to her skin in November 1951. Apparently the slight rash that appeared in June had fully subsided well before the November application. Thus if the trial court should find from the preponderant credible testimony that Mrs. Wright's affliction was proximately caused by the November application it should find her cause of action accrued as of that date.

Reversed and remanded.

---

10. N.Y.Civ.Prac.Act, § 49(6).

11. This action was commenced on November 17, 1954.