### HEINEMANN v. BARFIELD.

### Opinion delivered October 28, 1918.

1. FOOD—CIVIL LIABILITY FOR INJURIES—PLEADING.—A complaint which alleged that defendant was a merchant dealing in flour; that he sold to plaintiff's husband flour which he knew or should have known contained arsenic, and that by reason thereof plaintiff was poisoned and suffered great physical and mental pain, *held* to state a cause of action.

2. SAME—LIABILITY OF DEALERS.—Persons who engage in the business of furnishing food for consumption by men are bound to exercise care and prudence respecting the fitness of the articles furnished, and they may be held liable in damages if, by reason of any negligence on their part, corrupt or unwholesome provisions are sold and persons are made ill thereby.

3. SAME—POISON IN FLOUR—SUFFICIENCY OF EVIDENCE.—Evidence held sufficient to sustain finding that defendant negligently permitted arsenic to be mixed with flour which he sold to plaintiff's husband, and which caused plaintiff to become ill.

4. EVIDENCE—EXPERT TESTIMONY—HYPOTHETICAL QUESTION.—A hypothetical question which embraced all the undisputed facts essential to the issue was proper.

Appeal from Jackson Circuit Court; *D. H. Coleman,* Judge; affirmed.

#### STATEMENT OF FACTS.

The appellee brought this action against the appellant. She alleged that appellant was a merchant in Newport, Arkansas; that he was a dealer in flour and other foodstuffs; that on or about December 11, 1916, the appellant sold to R. H. Barfield, the husband of the appellee, a sack of flour which contained arsenic, which the appellant knew was to be used by the family of R. H. Barfield, of which appellee was a member; that the appellant knew, or, in the exercise of that degree of care required

of him, should have known that the flour was impure, unwholesome and contained arsenic; that on the 12th of December, 1916, appellee ate some of the flour which had been prepared and cooked for food, and because of the poisonous substance in the flour she was caused to be violently ill and to suffer great physical and mental pain and anguish, and that she continues to so suffer; that her illness, pain and sufferings were caused by the wrongful act of the appellant in so selling for use as human food, the flour which contained poison as before alleged; that, by reason of the wrongful act of the appellant, the appellee was forced to spend money for medicine and medical attention, and will be compelled in the future to make such expenditure; that her health had been permanently impaired by reason of the wrongful act, all to her damage in the sum of $7,500, for which she prayed judgment.

The appellant moved to require the appellee to make her complaint more definite: First, by ''setting out what degree of care the law requires of one who deals in food for human consumption;'' second, by ''setting out what wrongful act upon the part of the defendant the plaintiff relies.'' The motion to make more specific was overruled, whereupon appellant filed a general demurrer which was also overruled, and the appellant answered specifically, denying the allegations of the complaint and alleging that if the plaintiff was injured from eating unwholesome food, it was the result of her own negligence; that R. H. Barfield had equal opportunity with the appellant for determining whether the flour contained poisonous matter at the time of the purchase. Appellant further alleged that there was no privity of contract between the appellee and the appellant in the purchase of the flour, and that the appellee assumed the risk of using the flour if the same was unwholesome, as alleged.

The facts are substantially as follows: R. H. Barfield was a colored man living on appellant's place as a tenant. Appellant was a merchant and furnished Barfield his supplies. Appellee was the wife of R. H. Bar-

field. Living in the house with Barfield and his wife were Foreman Adkisson and his wife and child, Barfield's father and his wife, and R. H. Barfield's two children. On the morning of the 12th of December, 1916, the appellee cooked biscuits out of a sack of flour that had been purchased from the appellant a few days before. Appellant was a retail merchant, and had purchased the flour in question from the Stevens Grocery Company, a wholesale grocery firm of Newport, Arkansas. Appellant did not know where the flour was made. The flour was sold to Barfield or Foreman Adkisson by one of the appellant's clerks. Appellant knew nothing of the sale of the particular sack of flour at the time it was sold. The flour was one of three sacks that had been kept in a large bin lined with tin. It had a front door which let down with hinges and a screen for ventilation. The flour was kept in sacks. There were three sacks that had been torn and the flour in them had been put into new sacks and these sacks were tied with a string like an ordinary bag. The flour in question was in one of the sacks that had been so refilled. There was some loose meal and flour in the bin the day that the sacks were refilled, which was cleaned out and thrown into the refuse can and burned on the same day that the flour in question was sold.

Appellee testified that the sack in question from which she took the flour was not a full sack and appeared to have been opened and tied up. There was a small hole in the side of the sack. She took the flour out of the top of the sack with her hand, rolled the dough on the board which she always used, and used the same pan that she had been using before. Appellee and her husband, Foreman Adkisson and his wife, and appellee's father were all that were at the table. Soon after eating breakfast they all became sick. A physician was sent for and he arrived about 9 o'clock. He found R. H. Barfield on the floor very sick, vomiting and his bowels moving involuntarily. The condition of the others was the same but not so severe. He sent for three other physicians. They

diagnosed the symptoms as having been caused by acute arsenic poisoning.

A portion of the flour left on the bread board after mixing the dough for the biscuits was preserved in an envelope and delivered to a chemist, whose analysis showed that it contained 35.3 per cent. of arsenic. The sack of flour, from which the biscuits were made, was taken by one of the doctors who found a large quantity of arsenic in the sample that came off the top of the sack, but found none in that which came out of the middle or the bottom of the sack. Before beginning to use from the sack of flour in question, appellee had set the same un-emptied in her flour barrel. After the occurrence the flour was emptied into the barrel and was thereafter taken out of the barrel by Doctor Stevens and put in a sack.

It was shown that on October 15, 1916, one of the employees in appellant's store bought a two or two and a half ounce package of rough-on-rats. The druggist who made the sale testified that rough-on-rats runs all the way from 15 to 20 per cent. arsenic. The day after the occurrence appellant went to the Barfield home in company with the sheriff and another, and they gave orders to burn the barrel from which the flour had been taken. A cup of the flour had been taken out of the barrel to be saved for a sample, and appellant ordered this flour thrown in and burned with the barrel, saying the chances were that some of the rest of them out there might get poisoned out of that flour.

It was shown that Albert Lichtig, an employee of the appellant, who had charge of the grocery department, put out rat poison all around the flour bin. He went out and bought some cheese and took the poison and fixed it on the cheese. The witness who observed this did not know whether he put the poison in a hole in the cheese or just sprinkled it on. Witness was not instructed to take up the poison the next morning after it was put out. Appellant had dogs that were in the store very often. Something like a week before the 12th of December, 1916, Lich-

tig cleaned up the bin, taking the flour from the floor of the bin and putting it in one of the sacks. There was testimony on behalf of the appellant tending to show that the loose flour that was in the bin after resacking was scraped up and put in the refuse can and burned; that one of these sacks of flour was sold to the negro porter, one was sold and sent to a family living on a boat, and the other to Adkisson or Barfield; that none of the porter's family, nor the family on the boat suffered any injury from eating the flour; that the rough-on-rats was purchased by appellant's employee on October 15, and was put in a hole made in cheese and the cheese placed on card boards set about on the floor of the store for the purpose of killing rats; that this was done for a period of about fourteen nights from the date of the purchase of the rat poison; that the same cheese and the same poison was used each night; that appellant personally knew nothing of the sale of the flour, nor of any poisonous substance in the flour, if there were any at the time of the sale; that the sack was tied with a string; that pure arsenic was found in the sample of flour sent to the chemist; that it was arsenous acid, odorless and colorless; that rough-on-rats had both odor and color; that the flour claimed to have been purchased by Barfield was taken from the store to his house on the 9th of December and set in his kitchen on the floor until Tuesday, when the contents were poured into a barrel in which flour was kept; that some of the old flour was still in the barrel and that no meal was found mixed with any of the flour in any of the sacks.

Appellant himself testified as follows: The flour was kept in a bin underneath the grocery shelf. The bin was lined, on the inside, with tin with a small trap door over the top, twelve or fourteen inches wide, the center of it was screened with wire and the balance nailed up with zinc with two boards in front underneath the screen door. It was built nearly two years ago. The back of the bin was made of shiplap with zinc covering; back of the shiplap was made of brick. We kept the flour sacked up in the bin. About six or seven weeks before the poi-

soning, I sent Alex Franks after some rat poison and explained to Albert how to mix it and lay it out. I instructed him to put some rough-on-rats in one or two eggs and mix it up, and put it on top of the cheese and lay it on a little piece of paste board. He got everything ready and I told him to put it in the drawer of the desk and then put it out at night. I have dogs at the store, and when the store was opened I instructed my clerks to pick up these pieces so the dogs would not get hold of them. These pieces of cheese were put on the hat shelves just west of the bin towards the door; the rat holes were about fifteen or twenty feet from the bin.

There was testimony tending to prove that Barfield himself did not buy any flour on the 9th of December. There was also testimony tending to show that dough mixed of flour, lard, salt and soda, with 22 per cent. of rough-on-rats in it made a blue dough. This dough was exhibited to the jury.

The court, over the objection of the appellant, gave to the jury instructions in the form of interrogatories as follows:

No. 1. Do you find by a preponderance of the evidence that R. H. Barfield and not Foreman Adkisson bought the flour at Heinemann's store? Your answer will be "yes" or "no."

No. 2. Do you find by a preponderance of the evidence that arsenic was in the flour at the time it was sold at Heinemann's store? Your answer will be "yes" or "no."

No. 3. If you answer question No. 2 "yes," do you find by a preponderance of the evidence that Heinemann, or any of his employees at the store were guilty of negligence in allowing arsenic to get in the flour, or were guilty of negligence in knowing, or in failing to exercise such care that an ordinarily prudent person should exercise to know that the arsenic was in the flour? Your answer is "yes" or "no."

No. 4. Do you find by a preponderance of the evidence that the plaintiff, Pattie Barfield, ate bread made

of said flour and was caused thereby to be sick, violently ill and suffered any injuries alleged in the complaint? Your answer is "yes" or "no."

No. 5. If your answer to question No. 1 is "no," your verdict should be for the defendant.

No. 6. If your answer to all the questions Nos. 1, 2, 3 and 4 is "yes" your verdict should be for the plaintiff.

No. 7. If your answer to either of the questions Nos. 1, 2, 3 or 4 is "no," your verdict should be for the defendant.

Instructions Nos. 8 and 9 told the jury in effect that it was the duty of a dealer in food for human consumption to exercise ordinary care, that is, such care as an ordinarily prudent person would exercise under like conditions to know that the food sold by him was wholesome and fit for consumption. Other instructions were given on the credibility of witnesses, the measure of damages, the burden of proof, and as to the form of the verdict.

The appellant prayed the court to instruct the jury to return a verdict in his favor, which the court refused. The appellant presented also other prayers for instructions which the court refused. The jury returned a verdict in favor of the appellee in the sum of $3,000. This appeal is from a judgment rendered in her favor for such sum. Other facts stated in the opinion.

*John W. Newman, S. D. Campbell* and *Gustave Jones,* for appellant.

1. The motion to make more definite should have been sustained. 22 Ark. 303; 95 *Id.* 6; 94 *Id.* 524; 3 *Id.* 207; 89 *Id.* 136; 75 *Id.* 369; 66 *Id.* 278.

2. Where a complaint states a cause of action for breach of contract, it is error for the court to permit plaintiff by evidence to completely change the nature of the suit and make it one for damages for a tort. 124 Ark. 206; 75 *Id.* 468; 109 *Id.* 206, 217-18; 76 *Id.* 332.

3. There was no averment of implied warranty or breach thereof. 48 L. R. A. (N. S.), 213; 19 *Id.* 923. If

there was an implied warranty, there could be no recovery, because recovery is not sought for breach of same, and there was no privity of contract. 76 Ark. 352; 55 L. R. A. 822.

4. In a sale of personal property for a fair price, there is a warranty of title but none as to quality. 19 Ark. 447; 21 *Id.* 353; 52 *Id.* 325; 76 *Id.* 355; 53 *Id.* 333; 68 *Id.* 505; 88 *Id.* 171; 51 L. R. A. (N. S.), 1112; 20 *Id.* 493; 11 Cyc. 1104; 23 *Id.* 1272; 45 Ark. 284; 70 *Id.* 65; 70 *Id.* 568; 89 *Id.* 110; 48 *Id.* 325; 74 *Id.* 144. See also 76 *Id.* 352; 114 *Id.* 140.

5. The doctrine of *caveat emptor* applies. 114 Ark. 140; 10 Wall. 383; 19 L. Ed. U. S. 987; 7 Allen, 29; 13 L. R. A. (N. S.), 382, etc.

6. Incompetent testimony was admitted in the hypothetical questions. 108 Ark. 387; 100 *Id.* 518; 103 *Id.* 196; 130 *Id.* 542.

7. It was error to refuse defendant's instructions. They state the law. 71 Ark. 38; 69 *Id.* 134.

8. The evidence is legally insufficient to sustain the verdict. 79 Ark. 608, 617, 621-3; 88 *Id.* 518.

*Ira J. Mack,* for appellee.

1. The complaint was sufficient, and the demurrer and motion to make more definite were properly overruled. The sale was a wrongful act, whether a breach of implied warranty of quality or not or whether defendant was guilty of negligence. 73 N. J. L. 729; 118 Am. St. 727. The wrongful act need not be intentional, or with malice. Tiffany, Death by Wrongful Act, 131; 30 A. & E. Enc. L. (2 ed.), 1306. Intent is not an essential element of negligence. 29 Cyc. 421. Under the complaint plaintiff was entitled to recover either for breach of implied warranty or for negligence, or both. 93 Ark. 392; 74 *Id.* 144; 115 Minn. 172; Ann. Cas. 1912 D, 775.

2. There was an implied warranty in the sale of the flour that it was wholesome and fit for use as food. 35 Cyc. 407; 11 R. C. L. 1119; Elliott on Cont., § 129; 15 A. & E. Enc. Law (2 ed.), 1228; Mechem, Sales, § 1356; 76

Ark. 352; 197 S. W. 698; L. R. A. (N. S.), 1917 B; *Catani* v. *Swift & Co.,* 21 L. R. A. 139.

3. There was privity of contract. One for whose benefit a purchase is made may sue. 30 A. & E. Enc. L. (2 ed.), 207; 121 Ark. 414.

4. As to measure of damages, see 129 La. 838; Ann. Cas. B, 1913, 1110.

5. The verdict and judgment are correct and should be sustained on the ground of breach of implied warranty and negligence. 11 R. C. L. 1118; Cooley on Torts (Students' Ed.), § 373; 21 A. & E. Enc. L. (2 ed.), 461; 139 Mass. 411; 52 Am. Rep. 715; 57 L. R. A. 428; 114 Ark. 140; 200 Fed. 322; L. R. A. 1917 B, 1274.

6. There was no error in admitting the hypothetical questions asked nor in the instructions. Thompson on Trials (2 ed.), § 2403.

WOOD, J., (after stating the facts). 1. The complaint in substance alleged that the appellant was a merchant dealing in flour and other provisions; that he sold to the husband of appellee flour, which he knew at the time, or by the exercise of that degree of care which the law required of him should have known, contained arsenic, a poisonous substance; that by reason of such wrongful act on the part of the appellant, the appellee was poisoned and suffered great physical and mental pain resulting in her damage. The complaint was not skilfully drawn, yet, when taken as a whole, it stated facts sufficient to constitute a cause of action against appellant for the negligent sale of flour containing poison, which resulted in injury to the appellee. Where a complaint alleges facts, which, if proved, would show that the acts complained of were negligent or wrongful, it is unnecessary for the pleader to so designate them.

Alleging that a dealer sold flour which he knew at the time, or should have known, contained arsenic, which sale resulted in the poisoning of another, is the statement of a fact and not merely a legal conclusion. In *Fordyce* v. *Nix,* 58 Ark. 136, we said: "Under the reformed pro-

cedure courts regard the substance rather than the form. * * * 'The character of the action must be determined by the nature of the grievance rather than the form of the declaration.' " See also *Crowder* v. *Fordyce Lumber Co.,* 93 Ark. 393, 394; C. J., vol. 1, p. 1018. The complaint tendered an issue which, being denied by the answer, made the issue complete and called for the proof. The court did not err in overruling the demurrer, and the motion to make more specific.

2. Under the instructions of the court, the only issue presented to the jury was whether or not the appellant was guilty of negligence in selling flour that contained arsenic. While the manner of presenting this issue under instructions in the form of interrogatories was peculiar and unusual, yet, after carefully considering these instructions, we conclude they correctly state the law and contained no reversible error. The interrogatories were clear and concise, and the jury could not have been misled into giving an erroneous answer, or one that they did not intend.

The duty which a retail seller of food for immediate consumption owes to his customers is succinctly and correctly stated in Ruling Case Law, as follows: "Persons who engage in the business of furnishing food for consumption by man are bound to exercise care and prudence respecting the fitness of the article furnished, and they may be held liable in damages if, by reason of any negligence on their part, corrupt or unwholesome provisions are sold and persons are made ill thereby." 11 R. C. L. 1118, and cases cited in note. Actionable negligence in such cases is the failure to exercise such care as a man of ordinary prudence would exercise under the same circumstances to prevent injury and damage to his customers by the sale of articles which he knows are bought by them for immediate use as food. Pollock, Torts (8 ed.), 28; 1 Thompson on Negligence, § 23.

Where the cause of action is predicated not upon implied warranty but upon the negligent sale by a retail dealer of unwholesome food products for immediate con-

sumption, liability for the damages resultant from the sale of such food products is not confined alone to the immediate purchaser thereof. The liability extends to any persons who might reasonably be expected to suffer injury therefrom. The liability in such cases does not grow out of contract, and is not based upon implied warranty, but upon negligence, that is, a failure to exercise ordinary care to prevent injury to those who the seller of the unwholesome article of food might reasonably anticipate would be injured. *Ezra Craft* v. *Parker Webb & Co.,* 96 Mich. 245, 21 L. R. A. 139. See also *Colyar* v. *Little Rock Bottling Works,* 114 Ark. 140, 146. Instructions Nos. 8 and 9 given by the court correctly declared the law in conformity with the rules above announced.

3. Appellant contends that the evidence on the issue of negligence is not sufficient to sustain the verdict. The testimony bearing on this issue is set forth in the statement, and it could serve no useful purpose to discuss it in detail. There was decided conflict in the evidence, but it can not be said that the testimony of the witnesses on behalf of the appellee tending to show negligence on the part of the appellant was contrary to the physical facts. The jury were warranted in finding from this testimony that the appellant caused "rough-on-rats" containing arsenic in such proportions as to constitute a deadly poison, to be placed around and in such close proximity to the flour bin that such poison was carried by mice or rats to the flour in the bin; that such flour was sold to appellee's husband, which sale caused the injury of which she complained.

The undisputed evidence shows that the appellee was injured by arsenical poison. There was testimony tending to prove that flour, taken from the same sack out of which the flour was used for making the biscuits of which appellee ate, contained arsenic in deadly quantities; that a sample of the flour remaining on the bread board after appellee had mixed the dough for the biscuits also contained arsenic. Under the testimony adduced it was an issue for the jury to determine whether this poison was

communicated to the flour through the negligence of the appellant in directing the rat poison to be placed in proximity to the flour bin, as shown by the testimony of the witnesses on behalf of the appellee. Without pursuing the matter further, it suffices to say that the issue was for the jury, and there was evidence of a substantial character to sustain the verdict.

4. Appellant duly objected and excepted to the ruling of the trial court in permitting appellee to propound to one Doctor Willis a certain hypothetical question, and in permitting witness to answer same. The question embraced all the undisputed facts essential to the issue as to whether the injuries of which appellee complained were produced by arsenical poison. The specific objection, pointed out by learned counsel for appellant in their brief is, that there was no testimony tending to prove that appellee prior to the date of her injury was a healthy person. Appellee was asked, "What was the condition of your health prior to the time, or before the time you got poisoned?" Her answer was, "My health was always good. I could do most anything in the way of work." Her answers further show that she did both farm and house work.

The hypothetical question was well within the rule announced in *Taylor* v. *McClintock,* 87 Ark. 243, 294; *Ford* v. *Ford,* 100 Ark. 518, 524; *Williams* v. *Fulkes,* 103 Ark. 196; *Newport Mfg. Co.* v. *Alton,* 130 Ark. 542. The record presents no reversible errors and the judgment is, therefore, affirmed.