GREAT ATLANTIC & PACIFIC TEA COMPANY *v.* GWILLIAMS.

4-3579 and 4-3580

Opinion delivered November 19, 1934.

*King, Mahaffey, Wheeler & Bryson,* for appellant.
*Carrigan & Monroe,* for appellees.

BAKER, J. These two cases were consolidated for the purpose of trial, resulting in judgments for the plaintiff, Norma Jean Gwilliams, a minor, by Eva Gwilliams, her next friend, and the plaintiff, Bobby Joyce Gwilliams, a minor, by R. L. Gwilliams, her next friend, and from these judgments in favor of plaintiffs, defendant, the Great Atlantic & Pacific Tea Company has appealed. A very short statement of the pleadings will suffice in these cases, as the facts will be set forth somewhat at length. The reason for so doing is that the sole question to be determined in each case is whether the facts, as proved, are such as to justify the judgments rendered.

The complaint in each case alleges that the servants and employees in charge of the retail grocery store at Hope sold to R. T. Gwilliams, the grandfather of the two children, some cheese; that at the time of the purchase, Gwilliams asked for a pound of cheese that would be fresh, wholesome and nutritious, when in fact such cheese was, at the time of the sale, spoiled, contaminated and poison, and wholly unfit for human consumption, and that the servants and employees knew at the time of the sale of the cheese, or should have known, in the exercise of ordinary care that said cheese was spoiled, contaminated and unfit for human consumption; that it was not fresh, wholesome and nutritious as represented; that the appellant failed to exercise ordinary care in properly keeping and preserving the cheese.

That the two appellees, who ate some of the cheese, suffered from ptomaine poisoning for weeks, and that the health of each of them was permanently impaired, etc.

The evidence offered was to the effect that R. T. Gwilliams, his wife, his daughter, Eva Gwilliams, and her daughter, Norma Jean Gwilliams, about sixteen months old, drove from their home, about five miles, to Hope, at which place just before leaving for their home, R. T. Gwilliams purchased from the appellant a pound of cheese; that Mr. Gwilliams asked Mr. Daniels, who sold him the cheese, if he had some good cheese, and that the latter replied, ''Yes, I have some good cheese''; that he then told Mr. Daniels to cut off a pound, which was wrapped by Daniels in paper; that Daniels cut the cheese with a butcher knife; that the purchase was made about 12 o'clock on Monday. Gwilliams and his family ate some of the cheese on the road to their home. Norma Jean Gwilliams, about sixteen months old, was given some of the cheese. After reaching the home Bobby Joyce Gwilliams, another grandchild, about three years old, who lived a short distance away, came to the house of the grandfather about 3 o'clock in the afternoon, and the two children ate what was then left of the cheese; that about 6 o'clock in the afternoon Bobby Joyce Gwilliams was taken ill; was picked up by the grandmother, and was apparently very sick. Her father came for her and took her home fifteen or twenty minutes later. The other child, Norma Jean Gwilliams, was taken ill, and just as they were about to eat supper she commenced to vomit, as had the older child, Bobby Joyce. An examination of the vomit disclosed undigested portions or small particles of the cheese. Dr. Hilton was sent for and came about two hours later and treated the children. They soon recovered from the violence of the attack. The wife and daughter ate some of the cheese and complained that it made their throats sore. The children have not been well since they ate the cheese, have not grown, although it has been a year since the cheese was eaten by them. Prior to that time they were healthy and strong. The health of both has been impaired. Gwilliams further testified on cross-examination that he lived about five and

one-half miles from Hope; that he got to Hope about 10 o'clock and went in a wagon; that they had breakfast that morning before they left home; doesn't remember what the baby, Norma Jean, had for breakfast; was in Hope about two hours before the purchase of the cheese. His wife had bought some crackers, only ate them when he bought the cheese. He saw the cheese and paid little attention to it. It looked all right. Didn't know about it being fresh because they didn't examine it. The piece of cheese was cut from a larger piece weighing five or six pounds. At the time the cheese was given to the baby, he didn't suppose he paid any attention to it, he was driving and didn't look around. His wife ate a little bit, and he ate a little bit himself as they were going home; that he ate some crackers; that when he got home he had dinner, didn't recollect what they had; didn't think the baby ate that day; that it was still nursing and ate very little at any time; that Bobby Joyce had eaten dinner at home before she came there; it was about 3 o'clock when the children ate the cheese at witness' home. They were on the back gallery or in the kitchen. Perhaps they went out in the yard before they ate it. They were given what they wanted of it; didn't know how much Norma Jean ate, but saw her eat it, but she had a very little bit on the way home from Hope; wasn't certain whether or not she ate dinner.

Mrs. Etta Gwilliams testified that she was the grandmother of the children, and also testified substantially to the same facts that her husband had related, stating, however, somewhat more definitely the fact that the small child, Norma Jean, ate a very small portion of the cheese on the way home, and that they arrived there about 2:30 or 3 o'clock; that the cheese was eaten because of the fact that they knew they would get hungry before they got home; that Bobby Joyce and Norma Jean both ate of the cheese after they reached home. The witness cut a piece or two and divided it for the children, and they ate it. There was not a great deal left when they got home. She further testified that they did not have crackers, but she had bought two packages of light bread rolls or biscuits; that Norma Jean ate a little of this

bread before they reached home; that she unwrapped the cheese, and didn't see anything wrong with it. If she had, she would not have eaten it. It looked nice and tasted all right, though she said she paid but little attention to it; that at the time she divided the cheese for the children, she unwrapped it, and there was not a great deal of it left; that she split a big piece of cheese in two and gave a piece to each child. The piece given to the little baby was not very large. Bobby Joyce did not eat dinner at their house, because she had eaten her dinner at home. The witness testified that she herself had eaten somewhat more of the cheese than the others, and at about 3 o'clock her mouth felt like it was scalded, and that she got sick at her stomach.

Eva Gwilliams testified that she was the mother of Norma Jean, and that they left Hope between 11 and 12 o'clock, or about noon; that her father had bought the cheese, and they all ate of the cheese as they were going home; that they made the trip in a wagon. She said they began tasting the cheese right after they got out of town; that she fed her baby, but didn't feed it very much, just a little piece. It didn't eat very much. She also said that they did not eat when they got home, or until they fixed supper, but that the children ate some of the cheese. She testified further that she was made sick; that her throat got sore, and that she ate only a small piece of the cheese. On the trip home they didn't have any knife to cut the cheese with, but broke it off with their fingers and ate it; that the cheese looked all right and tasted like other cheese; that she never ate anything but nice fresh cheese, and that this cheese looked nice and fresh; that she wouldn't have given it to the baby if it hadn't looked that way; that they gave to the babies three crackers apiece, and they ate the crackers with the cheese; that she and her mother got sick about the same time.

Dr. Hilton, the physician who was called to treat the children, testified that he found the children to be nauseated and vomiting and suffering from dizziness, that they had turned purple and looked and acted like they had symptoms of the cramps; that after the little girl had

vomited she would drop off in a comatose or sleepy condition; that her heart was irregular; that he didn't make a chemical examination of the substances seen by him which the children had vomited; that all he saw was film or phlegm with little pieces of cheese; that the children's mouths and throats were corroded; that this condition was attributable to poison; that it was his opinion that the cause of this corroded condition was ptomaine poison caused from the cheese, if that was all that was eaten.

Dr. Martindale also testified that he treated the children; that they had been taken sick, and some days later they were brought to his office; that he examined them and found that they had sore mouths and tongues; that their throats were irritated and tender, gums swollen and throat very sore; stomachs bloated. It was his opinion that ptomaine poison caused the condition. He also said that cheese was not the best food for very young people, but, if good, cheese was not apt to set up irritation of the stomach, such as these children suffered.

Dr. Joe Ellis Tyson, on behalf of the appellant, testified that young people are unable to assimilate cheese; that the digestive secretions are not able to break it down; that this fact brings on the vomiting and symptoms similar to those from which the children suffered, except that he does not say that this would cause the corroded condition of the mouth and gums, as testified by Dr. Hilton. He testified further that he would not necessarily attribute a condition of that kind to anything being wrong with the cheese. He did testify that ptomaine poison is due to the intake of decomposed food protein. If some of it should get on cheese, it would poison.

Mr. Daniels testified that he was with the Atlantic & Pacific Company, and that he remembered the occasion of selling Mr. Gwilliams cheese, about the 17th of April. His attention was first called to it four or five days later when Mr. Gwilliams made complaint to him about it. This cheese was cut from a hoop of the Wisconsin Daisy Cheese. He had been selling this cheese ever since he had been with the company, about three years. They sold about three times as much of that as they did the

other varieties of cheese; that the amount, however, would vary with the season of the year. Ordinarily about the spring of the year they would handle about four hoops a week. This was sent to their place from Dallas by commercial truck. The cheese came in a wooden hoop or box; that the cake of cheese had a covering on it. There was a very thin piece of wood which was on the top and bottom inside the box, then there was cheese cloth. The cake of cheese was entirely inclosed with the cloth; that the particular hoop from which Mr. Gwilliams bought his cheese came to the store Thursday before the sale, which occurred on Monday following. When cheese was received, it first went into the big cooler, and then to the serving counter or display case; that the display case had several doors to it, with packing around the doors to hold the refrigeration; that the temperature maintained in it, and in the big box was from 34 to 36, or 37 degrees. They kept meat in the display case. Some of it was cut up ready to serve. It was kept both ways. They kept beef, pork and cured meat and cold meat, and on week-ends they kept fish in it; that he got this hoop of cheese out of the big box and commenced to sell off of it on Monday. It had been kept in the other box until Monday. He took the cheese out of the hoop and cut it half in two, and then quartered it, and usually put three pieces back in the big cooler, or the big box, and a quarter in the display counter. He had had experience with cheese, and this was all right, as far as he could tell. It appeared to be in proper condition. He thought he sold to Mr. Gwilliams from the first quarter placed in the counter. He looked at the piece he cut off. It looked and appeared to be all right, did not see anything wrong with it. It looked like the cheese he sold every day. All of it looks very much alike. He kept the knives and display case, and other places clean. On Monday the big box, the large cooler box, was washed, hooks inside of the box were washed each Monday. The rest of the market was washed from day to day through the week. The big box was washed one day a week. The display counter was washed on Saturday night after closing business, and at such times through the week as was found neces-

sary; thought he had always had the reputation of keeping the place clean. They considered it the best part of the business, and had comments on the cleanliness of the market; tried at all times to keep the market clean; that they did not keep any putrefied or spoiled meat in the display case, or any other place. As to knives, they were washed, towels were kept in the market to keep the knives clean; that he cut this piece of cheese for Mr. Gwilliams with a knife, and, going by their habit in things like that, they usually wipe the knife whenever they get ready to use it; that he had not been cutting any spoiled meat with that knife, or cutting anything that was putrid in any way; tried to keep their hands and persons perfectly clean, and when he handled this cheese his hands were clean. He continued to sell that whole block of cheese; sold the whole hoop to his regular customers, and he had quite a few customers there in the city of Hope and surrounding country. He had no complaint about the cheese, except what Mr. Gwilliams was alleged to have made.

On cross-examination, he repeated much he had already stated, and in addition some other facts. He had cut some meat with that knife. He put the cheese on the meat block, and cut the cheese on the meat block, and put it in the case; kept a light on the inside of the case; that he kept steak in there, and fish on the week-end; they kept practically everything in there, except ground meat. Perhaps would not have remembered the particular sale if Mr. Gwilliams had not come back and called his attention to it. The cheese had been shipped to Hope by commercial truck covered by tarpaulin with no refrigeration.

The completeness of this statement as to all detail is made necessary for the reason that these two suits were prosecuted upon the theory that the appellant had been guilty of negligence, by reason of which the injuries or illness of the children followed.

The appellant earnestly contended that the appellees in these cases have failed to discharge the burden placed upon them to prove negligence resulting in the alleged injuries. No question is raised as to the com-

petency of any evidence or as to any error in the instructions, except that appellant contends that the court should have directed the verdict for the appellant.

For the purpose of this opinion we treat the facts as being sufficient to show that the children suffered from ptomaine poison, occasioned by active putrefactive agencies. The condition of the children was serious. According to the evidence, a very small bit of this poison may become very violent and active, quickly impairing the health, if not endangering the life, of the unfortunate victim who happens to eat food contaminated by it.

The briefs have been carefully studied, other investigation has been made of authorities. We agree with counsel for appellees as to the correct rule announced in the case of *Heinemann* v. *Barfield,* 136 Ark. 456, 207 S. W. 58, as follows: "The duty which a retail seller of food for immediate consumption owes to his customers is succinctly and correctly stated in Ruling Case Law, as follows: 'Persons who engage in the business of furnishing food for consumption by man are bound to exercise care and prudence respecting the fitness of the article furnished, and they may be held liable in damages if, by reason of any negligence on their part, corrupt or unwholesome provisions are sold and persons are made ill thereby.' 11 R. C. L. 1118, and cases cited in note. Actionable negligence in such cases is the failure to exercise such care as a man of ordinary prudence would exercise under the same circumstances to prevent injury and damage to his customers by the sale of articles which he knows are bought by them for immediate use as food."

The theory now is that, in the handling or sale of standard packaged goods, inspection is not required, expected, or anticipated of the dealer. Such inspections could not be made, in most instances without destroying or damaging package protective coverings.

In the case of *Coca-Cola Bottling Co.* v. *Swilling,* 186 Ark. 1149, 1153, 57 S. W. (2d) 1029, this court said: " 'The retailer owes to the consumer the duty to supply goods packed by reliable manufacturers, and such as are without imperfections that may be discovered by an exercise of the care, skill and experience of dealers in such prod-

ucts generally. This is the measure of the retailer's duty, and, if he has discharged it, he should not be mulcted in damages because injuries may be produced by unwholesomeness of the goods. As to hidden imperfections, the consumer must be deemed to have relied on the care of the packer or manufacturer or the warranty which is held to be implied by the latter.' The annotated cases cited in the notes to the text quoted appear to sustain the text.''

The retail dealer is not a guarantor, and this case is not founded upon that theory, but he is charged with the exercise of ordinary care to sell sound and wholesome products, meaning that degree of care necessary for the protection of customers against impurities or contamination that might ordinarily be discoverable by any usual or ordinary tests. This cannot mean, however, that the retail dealer must make or apply such tests as would in every case operate to insure absolute safety. Hidden or concealed imperfections or contaminations might require microscopical tests or chemical analysis for their discovery. Under present conditions, such requirement would prove so burdensome that many articles in ordinary use could not be handled by the ordinary dealer, and consumers would be denied the right to buy such products. In other words, such a test, if applied under the ordinary conditions, would be equal to requiring the dealer to become an insurer of the absolute perfection of the commodity sold. The test should not be higher than that commonly or usually practiced by careful dealers under the same conditions and circumstances, which is at least as high as the consumer expects, or has the right to expect of his groceryman or food dealer.

The essential facts in this case are not in dispute. Daniels remembers that Mr. Gwilliams called upon him a few days after the cheese had been sold to him, and made complaint of its unsoundness or unwholesomeness, and this called to his mind the incident of the purchase, and he is practically sure that this was the first piece cut by him from the quarter that he had put in the display counter. He says that he examined it at the time he cut it; that there was nothing wrong with it that was ap-

parent. No doubt he would not have hesitated to send this particular cut of cheese to his own home for consumption by his own family.

It is urged, however, that he cut it upon the meat block where meats were cut, and where fish was probably sometimes cut, and that he used a knife which was sometimes used, or which may have at all times been used, to cut meat; that the contamination might have come from the contact of the cheese with the block, or its contact with the knife. That could be true, but this is within the realm of speculation and conjecture. This contamination might also have come from the paper with which it was wrapped. It is also just as probable that it may have come from contact with the hands of those who later carried it, opened it while upon the road home. Mrs. Gwilliams and her daughter both handled the cheese. They could observe its quality, its purity, its apparent freedom from contamination, and the matter need not be argued that, if it had had any appearance of being contaminated or unwholesome, these good people would not have given this food to the children who suffered from it. They had gone to town in a wagon, had no doubt used their hands in climbing in and out of the wagon. Childrens hands are frequently not clean when not at home under the attentive care of those charged with the duty of their protection, and still, as a matter of speculation or conjecture, it may be that the children's hands were not wholly free from contaminating conditions. All of these matters are set forth, not as being true conditions, which prevailed, but as tending to show the danger of speculation in order to determine, without evidence, the means whereby the cheese had become unsound or unwholesome for human food.

It is argued in the brief of appellees that the cheese had been shipped by commercial truck from Texarkana to Hope, that it may have thus become contaminated. If so, and this fact of such contamination was not discoverable by the exercise of ordinary care, then the negligence was that of another party and not of the appellant here. To hold otherwise would be to hold the appellant as an insurer of the wholesome condition of the

food. It will be remembered that the appellant was a dealer and not a manufacturer; that it had handled the same brand of cheese for a long period, and that the cheese had always been found to be wholesome and sound, and that no other part of this same hoop of cheese had been found to be unsound, and the fact that a small particle thereof may have been unwholesome, when that condition was not discoverable in the exercise of ordinary care, would be insufficient to justify a determination by us that plaintiffs need not prove negligence either directly or inferentially by circumstances. Daniel's statement was not inconsistent or in conflict with other testimony; it was not unbelievable or unreasonable.

Daniel says that the market was kept clean. The knives were clean, and they kept no putrid meats. They kept their hands and persons clean. Should he have been believed? *Fleming* v. *L. R. Chamber of Commerce*, 137 Ark. 615, 206 S. W. 895; *Runyan* v. *Goodrum*, 147 Ark. 481, 228 S. W. 397; *Toll* v. *Lewis*, 136 Ark. 318, 206 S. W. 442.

Authorities in cases involving negligence of vendors, as distinguished from the implied warranty, are not lacking. This court seems to have followed in all decided cases the weight of these authorities. There must be proof tending to show the negligence alleged before there is a recovery. Negligence, like fraud, is not presumed, but it must be proved, or, at least, facts must be shown from which it may be inferred.

The case of *National Cotton Oil Co.* v. *Young,* 74 Ark. 144, 85 S. W. 92, is in point. The facts showed that Young bought a load of cottonseed hulls and a sack of cottonseed meal from the oil company, and he himself loaded the hulls in the wagon with a large fork, direct from the factory. He mixed the meal with the hulls, and fed the mixture to his cows. The cows died shortly afterward. An examination of one of them disclosed nails, pieces of wire and other foreign substances in the throat and stomach. The meal and hulls were examined and similar metallic substances were found in both. Young sued the oil company, relying both upon the implied warranty of the feedstuff, and upon negligence,

The question of implied warranty was eliminated by a prior decision of this court, so the case went to the jury upon the question of negligence.

The jury returned a verdict as follows: "We, the jury, find for the plaintiff, J. E. Young, the sum of one hundred dollars, and believe the foreign matter got into the feed by accident." This finding was upon evidence adduced by the oil company tending to show that it was impossible for such foreign substances, as found in the feed, to have gotten into it in the process of manufacture, and necessarily that such substance got into the meal and hulls after they were manufactured. The court held that negligence was not established, though some proof was offered from which the jury might have inferred that the foreign matter got into the feedstuff through negligence of the employees of the oil company. The point is that the unfit condition of the feedstuff for consumption by the cattle did not establish negligence.

In a much more recent case, that of *Colyar* v. *Little Rock Bottling Works,* 114 Ark. 140, 146, 169 S. W. 810, this court distinguished the case under consideration from the case of *O'Neill* v. *James,* 138 Mich. 567, though both cases are based upon the fact that a bottle of soda water or coca-cola exploded by reason of an overcharge of gas, doing injury to the one handling the bottle.

In the case of *O'Neill* v. *James,* the proof offered did not show knowledge on the part of the defendant that the bottle which exploded had been improperly charged with gas, while in the case under consideration, proof was offered that the producer or manufacturer had information of the fact that bottles frequently exploded when handled, and he knew, or should have known, of the unsafe condition of the overcharged bottle. In the case of *O'Neill* v. *James,* the proof of negligence was the explosion of the bottle. The judgment for plaintiff was reversed. In the Colyar case it was held that with the evidence, in addition to the fact of the explosion, the case should have gone to the jury. It is argued in appellees' brief, but not found in the abstract of evidence, that the meat block was contaminated with soured and putrid particles of meat, etc. If this were evidentiary,

and not merely conjectural, a different case would be presented.

In the case of *Heinemann* v. *Barfield,* 136 Ark. 456, 207 S. W. 58, it was found that flour sold to the plaintiff contained arsenic, and it is also shown that an employee of the appellant had a short time before this sale bought "rough on rats" from a neighboring druggist which, according to the druggist's statement, contained fifteen or twenty per cent. arsenic, and this had been put out near or around the flour bin, and that the appellant had burned some flour, saying that "the chances are some one else might get poisoned from this same flour."

In the case of *Drury* v. *Armour & Company,* 140 Ark. 371, 216 S. W. 40, and the same case reported again in 146 Ark. 310, 226 S. W. 133, there was proof in regard to the sausage sold that there was a green, slimy piece, as big as one's thumb, which was wet and soggy, and gave out a bad odor, and that it smelled like it was rotten. This was a condition that should have been discovered in the exercise of ordinary care.

In the case of *Safeway Stores, Inc.,* v. *Ingram,* 185 Ark. 1175, 51 S. W. (2d) 985, Ingram was made sick by eating a piece of cheese loaf, purchased from appellant. The proof was that this loaf had a tainted taste; that one could tell from the looks of it that it was poison. It was also proved that it had mold upon it, and had the odor of spoiled meat.

In the research we have made we have not been able to find a case, nor have appellees cited one, decided by this court, wherein the injuries suffered were held to be sufficient proof of negligence to justify a recovery. Such a holding would seem to be against the weight of authority.

It follows therefore that both cases should be reversed, and remanded.

It is so ordered.