AHRENS *v.* MOORE.

4-7285                                         178 S. W. 2d 256

Opinion delivered March 6, 1944.

*Rose, Loughborough, Dobyns & House,* for appellant.

*Bates, Poe & Bates,* for appellee.

McFADDIN, J. The question here is whether appellant is liable for the damages sustained by appellees who used anti-freeze in automobile radiators. Thirty-nine plaintiffs each filed a separate action for damages against appellant. Some were filling station operators who purchased the anti-freeze direct from appellant and used it in their own cars. Others were individuals or corporations in whose cars the anti-freeze was placed by the filling station operators. The actions were consolidated, and from plaintiffs' judgments there is this appeal.

The appellant, Albert Ahrens, doing business as Wholesale Appliance Company, was state distributor of Bond Anti-Freeze which was manufactured in another state. In August, 1942, appellant first began to handle this anti-freeze which was represented to him as a new formula and made without critical war materials. The anti-freeze was received by appellant in carload lots and stored in his warehouse and distributed in the original sealed containers to the filling stations. Appellant furnished his traveling salesmen with factory literature. He put some of the anti-freeze in his cars and trucks, and the salesmen knew this.

In making the sales, the agent of appellant told Donald Duncan (one of the appellees and also owner of one of the filling stations from which some of the other appellees received the anti-freeze), that the appellant had knowledge of the contents of the anti-freeze, that it had been tested, and that it had been used by appellant and had no harmful effect on radiators, hose connections or other parts of the automobile. Likewise, in making the sales to Mr. M. H. Bird (one of the appellees and also owner of one of the filling stations from which the other appellees secured the anti-freeze), the agent told Mr.

Bird that appellant had tested the anti-freeze and that it was good for the intended use. One of the labels said: "This solution is concentrated and contains heavy minerals in suspension. Before dilution grandular or crystalline formation will appear as the temperature drops. This is normal and no damage will result therefrom."

Notwithstanding this label, appellant learned, about October 1, 1942, that the anti-freeze was solidifying in the original unopened containers, and he contacted the manufacturer over long distance telephone, and then notified the filling station dealers by letter as follows:

"IMPORTANT—PLEASE READ

"October 2, 1942

"Subject: Exchange of Bond Anti-Freeze

"Dear Sir:

"Please return to us at once by truck, freight charges collect the Bond Anti-Freeze recently shipped to you. This is at the factory's request. It seems they made a specially concentrated grade, some of which was included in our shipment by mistake. It tends to crystallize in the jugs.

"We have another car of regular Bond Permanent Anti-Freeze in transit from the factory.

"And we will replace for you, freight charges prepaid, the shipment that you return.

"Wholesale Appliance Company

"Albert Ahrens

"P. S. If any of it has been put in use, it is OK, and will prove entirely satisfactory."

Appellant continued to supply anti-freeze to the dealers after this letter with the same representation as originally made and heretofore detailed. The label on one of these containers reads in part: "New, different, better. Bond Anti-Freeze guaranteed permanent. Bond permanent Anti-Freeze Single Shot action. One filling lasts all season. Safe, non-corrosive, odorless. Made of

non-critical materials. Bonded performance, thoroughly tested and highly approved in laboratory tests. . . ."

It appears also in the record that there was no freezing weather in this section until some time after October 2; and that the cars herein were damaged in October and November, 1942; and that all of the anti-freeze, whether used before or after October 2, was equally harmful to the cars of plaintiffs. In a remarkably short time after being put in the radiators, the anti-freeze disabled the cars. Witnesses testified as to various damages: The anti-freeze solidified rather than remained liquid; it corroded radiators, destroyed rubber hose connections, ate out gaskets, got in the working parts of the cars, ruined ignition; and otherwise damaged the cars. The preponderance of the evidence is that the anti-freeze was in each instance used in accordance with the directions, and damaged the cars in which it was used.

These are actions for damages for negligence rather than breach of warranty. The questions are (1) whether appellant was negligent under the facts, and (2) whether that negligence is actionable. If there was no actionable negligence, then appellant's request for an instructed verdict should have been given. If there was actionable negligence, then the causes must be affirmed.

Respective counsel have submitted excellent briefs. It is argued *inter alia* by appellant that he was a wholesaler—neither a manufacturer nor retailer—and that he is not liable for any defect in the anti-freeze since it was sold by him in the original unbroken packages. Appellant cites on this point 11 R. C. L. 1124: "The situation of the retailer and consumer of packed products is properly governed by the rules of negligence law. The retailer owes to the consumer the duty to supply goods packed by reliable manufacturers, and such as are without imperfections that may be discovered by an exercise of the care, skill, and experience of dealers in such products generally. This is the measure of the retailer's duty, and if he has discharged it he should not be mulcted in damages because injuries may be produced by unwholesomeness of the goods. As to hidden imperfections the con-

sumer must be deemed to have relied on the care of the packer or manufacturer or the warranty which is held to be implied by the latter."

Appellees, on the other hand, claim that even if appellant is a wholesaler, still he is liable herein and they cite *inter alia* 24 R. C. L. 518: "Disclosure of Danger and Buyer's Knowledge—If the manufacturer or wholesaler would avoid liability to third persons, he can do so ordinarily by putting his immediate buyer in full possession of the facts. . . ."

Both sides have favored us with a wealth of authorities from this Court and others. Some of these we will discuss hereinafter. A few of the others, we now list, to-wit: *Coca-Cola Bottling Company* v. *Swilling*, 186 Ark. 1149, 57 S. W. 2d 1029; *Great Atlantic & Pacific Tea Company* v. *Gwilliams*, 189 Ark. 1037, 76 S. W. 2d 65; *H. J. Heinz Company* v. *Duke*, 196 Ark. 180, 116 S. W. 2d 1039; *Kroger Grocery & Baking Company* v. *Woods*, 205 Ark. 131, 167 S. W. 2d 869; *Kraft Phenix Cheese Corporation* v. *Spelce*, 195 Ark. 407, 113 S. W. 2d 476; *Smith* v. *Kresge Company*, 79 Fed. 2d 361; *Clement* v. *Rommeck*, 149 Mich. 595, 113 N. W. 286, 119 Am. St. Rep. 695, 13 L. R. A., N. S. 282; *Marsh* v. *Usk Hardware Company*, 73 Wash. 543, 132 Pac. 241; *Roberts* v. *Anheuser Busch Company*, 211 Mass. 449, 98 N. E. 95; *Neiman* v. *Channelene Oil & M. Company*, 112 Minn. 11, 127 N. W. 394, 140 Am. St. Rep. 458.

We now proceed to our determination. In 46 Am. Jur. 930, the rule is stated: "The dealer who purchases and sells an article *in common and general use* in the usual course of trade and business *without knowledge of its dangerous qualities*, is not under a duty to exercise ordinary care to discover whether it is dangerous or not. He may take it as he finds it on the market. He is not required to investigate its qualities or endeavor to ascertain whether it is dangerous for the use intended before he can absolve himself from liability in the event injury results from its use. There are many necessary articles and things in common and general use throughout the country that are dangerous unless used with care, but the

dealer who buys and sells them in the open market in the usual and ordinary course of his business, *and who makes no misrepresentations or concealments,* and who does not know that the article is explosive or dangerous in its ordinary use, is not to be made liable merely because some person is injured or killed while handling it.''

We have italicized three of the essentials in the above statement without the existence of which the rule of non-liability does not apply. We mention these:

The First: *''In common and general use.''* The evidence shows in the case at bar that this anti-freeze was itself a new product. It was not in common and general use like some of the standard brands of soap or tooth paste or hair tonics, now used. This anti-freeze was so experimental that a bond was said to have been made by the manufacturer to protect either the dealer or the ultimate customer from loss. (The proof is indefinite about which was protected.) This very fact of the newness of the product and its being made from a new formula—as testified to by appellant himself—shows that he was not selling an article *in common and general use;* so one of the essentials of non-liability is not present.

The Second: *''Without knowledge of its dangerous qualities.''* The evidence shows in the case at bar that appellant had received knowledge on October 1, 1942, that one shipment of the anti-freeze had solidified. He verified this by examining the original packages in his warehouse. He learned that this shipment had not been as represented in that it was too highly super-charged, yet in the postscript to his letter of October 2, 1942, he said that if any of it had been used, ''it is OK and will prove entirely satisfactory.'' By the admitted defect of this first shipment appellant was put on notice and was charged with all of the knowledge that a reasonable investigation would have disclosed, if made by a reasonably prudent man. Since he had knowledge of the defect in the first shipment and since proof was offered that the subsequent shipments proved as defective and as harmful to automobiles as the first shipment; then it was a question for the jury as to whether the knowledge pos-

sessed by appellant would have led a man of ordinary prudence to investigate the subsequent shipments, and if he did make such investigation, whether he found the subsequent shipments to be as bad as witnesses herein testify they were. In all events, the essential of the *absence of knowledge of dangerous qualities* was not shown in this case. In fact, there was evidence sufficient to indicate the converse. So this second essential of non-liability is not found in this case.

The Third: *"Who makes no representations."* Here there was positive evidence of representations as to fitness and quality, made by the appellant or his agents. The representations were: (a) that appellant had knowledge of the contents of the anti-freeze and that it had been tested, and (b) that it had no harmful effect on automobiles, (c) that it was good for the intended use, (d) that any of it even though supercharged would prove satisfactory. So there were positive representations which take the case at bar outside the rule of non-liability as stated in the text of Am. Jur. *supra.*

The rule stated in Am. Jur. *supra,* is a rule of non-liability when certain essential factors are present. The converse of the rule would be that where the essential factors are absent, there would be liability. Applied to this case the rule might be stated as follows: "Where a dealer purchases and sells a new and experimental product not in general use and with knowledge or notice of its dangerous qualities and makes positive representations that it is fit for its represented use, then he cannot claim immunity from liability for damages that follow from such use." This is our understanding of the situation that exists as shown by the evidence in the case at bar. In the American Law Institute Restatement of the Law of Torts, vol. II, § 402, the rule is stated:

"A vendor of a chattel manufactured by a third person is subject to liability . . . if, although he is ignorant of the dangerous character or condition of the chattel, he could have discovered it by exercising reasonable care to utilize the peculiar opportunity and competence which as a dealer in such chattels he has or should have."

We quote at length from that section as particularly applicable to the case at bar:

"A wholesale or retail dealer, who sells in their original packages goods bought from reputable manufacturers, acts as a conduit through which the goods pass from manufacturer to consumer, who buys them in reliance upon the manufacturer's reputation for competence and care. A vendor of such goods, therefore, is under no duty to subject them to rigid inspection or tests before selling them. He may, however, as dealer, have a special opportunity to know of circumstances, which to his experience as dealer, would indicate that the goods are likely to have deteriorated, as when he knows that goods, subject to deterioration by lapse of time, have been long kept in stock. If such is the case, he is subject to the same liability as though he knew of their defective character if he does not exercise reasonable care to inform the purchaser of the chance that the goods may have deteriorated. A retail or a wholesale vendor may, in the cursory inspection which he gives to the goods while handling them for the purpose of receiving and selling them, or during the periodical taking of stock, have an opportunity to observe indications which as a competent dealer in such commodities should cause him to realize that the goods are or are likely to be in a condition dangerous for use. These indications may be so slight that the vendor is not entitled to expect that they will be observable by any inspection which customers make or should make before buying and using the goods. Even if the indications are plainly observable by the customer they may be such that, although enough to cause a competent dealer to realize that they make or are likely to make the goods unsafe, they may convey no such intimation to a customer having no special experience with such goods. The rule stated in this section requires the retail or wholesale dealer to utilize not only the special opportunities which he has to observe the condition of the goods, but also the special competence which he, as a dealer in such goods, should have to realize the dangerous implication of conditions which though observable by the customer are not likely to be appreciated by him. His failure to inform

his vendees that the goods are or are likely to be dangerous is not excused by his ignorance thereof, if his ignorance is due to his failure to utilize his special opportunities and exercise his special competence for the purpose of discovering whether the goods are or are not safe for the use for which they are sold.''

Our own case of *Mann-Tankersly Drug Company* v. *Cheairs,* 75 Ark. 596, 88 S. W. 873, supports the views here expressed. In that case the plaintiffs ordered from the appellant drug company certain Charbonne (Anthrax) vaccine for plaintiffs' cattle. When the vaccine arrived it was labeled ''Black Leg'' vaccine. Plaintiffs inquired of the wholesaler (appellant) about the substitution, and were advised by letter that the Charbonne vaccine and the ''Black Leg'' vaccine were the same. Thereupon plaintiffs used the ''Black Leg'' vaccine on their cattle, and the cattle died. Plaintiffs sued the appellant (who was the wholesaler, not manufacturer) for damages; and this Court affirmed a recovery by the plaintiffs. The basis of the action was negligence. Mr. Justice BATTLE delivered the opinion of the Court, and it is ruling here.

In the case of *Lewis* v. *Terry,* 111 Calif. 39 (1896), 43 Pac. 398; 31 L. R. A. 220; 52 A. S. R. 146, the defendants were engaged in selling household furniture, and sold a folding bed to some customer by the name of Apperson. The Appersons installed the folding bed and rented the room to the plaintiff; and the folding bed fell on, and injured, the plaintiff, who then brought suit against the defendants claiming that the folding bed was dangerous by reason of the defect in its manufacture and ''that the defendants with full knowledge of such defect and of such danger sold the bed to the Appersons without warning them thereof, and assured them that it was perfectly safe.'' It seems from the reported case that this folding bed was an innovation in manufacture. At all events it was alleged that defendants knew of the defect and made positive. representations. In sustaining the complaint of the plaintiffs, the Supreme Court of California said: ''We agree that the action cannot be sustained on the ground of any privity of contract between plaintiff and

defendants, for there was none. . . . But when the seller, as in the case made by the complaint before us, represents the article to be safe for the uses it was designed to serve, when he knows it to be dangerous because of concealed defects, he commits a wrong independent of his contract, and brings himself within the operation of a principle of the law of torts.'' This California case is a leading case on this subject and has been cited in other cases all over the country.

In *Cunningham* v. *Pease Company,* 74 N. H. 435, 69 Atl. 120, 20 L. R. A., N. S. 236, 124 Am. St. Rep. 979, the defendant sold some stove polish to the mother of the plaintiff; and the defendants represented that the stove polish could be safely applied on a hot stove. The plaintiff, at the direction of her mother, so applied the polish and received injuries, and brought the action. The Supreme Court of New Hampshire held that the complaint stated a cause of action in tort because the defendants were guilty of negligence in falsely representing the safety of the intended use of the polish. This New Hampshire case is likewise a leading case on the subject of liability.

There are many other authorities all of which sustain the statement that where a dealer purchases and sells a new and experimental product not in general use, and with knowledge or notice of its dangerous qualities, and makes positive representations that it is fit for its represented use, such dealer cannot claim immunity from liability for damages that follow such use. That is the rule that we hold to apply in the case at bar. There was sufficient evidence introduced by the plaintiffs to carry the case to the jury under this rule.

It will be recalled that some of the plaintiffs were filling station operators who had purchased the anti-freeze direct from the appellant, and that others were automobile owners, who had received the anti-freeze from the filling station operators. The question of the liability of the wholesaler to the remote users is not raised in this case. The appellant has treated all of the plaintiffs as of the same standing and rank as that of the fill-

ing station operators, and we have, therefore, not explored that question.

We reach the conclusion that a fact question was made for the jury, and therefore the judgments are affirmed.